368 A.2d 272

**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**James Lloyd SMITH, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 18, 1974.

Decided Jan. 28, 1977.

Francis J. Moran, Philadelphia, for appellant.

Arlen Specter, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., Maxine J. Stotland, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

Following a jury trial, James Lloyd Smith, Jr. was convicted of murder of the first degree. Post-verdict motions were denied by the court *en banc* and judgment of sentence of life imprisonment was imposed. Smith appealed from the judgment of sentence, asserting seven assignments of error. We need only consider two since, for the reasons stated herein, we reverse the judgment of sentence and order a new trial.[1]

---

1. In addition to the assignments of error discussed in the text, Smith asserts: (1) that the trial court erred in admitting into evidence incriminatory statements given to police by Smith because

At trial, the Commonwealth introduced into evidence a number of incriminatory statements given to police by Smith. Smith asserts that the court's failure to suppress the statements was error because the statements were not the product of a rational intellect and free will, that is, they were involuntarily given.

It is well-established that on review from a finding of voluntariness, we must consider the Commonwealth's evidence and so much of the evidence presented by an accused as remains uncontradicted. *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968). So viewed, the evidence established the following:

In late June of 1971, Smith attempted suicide by cutting his wrist. This attempt did not require hospitalization. Thereafter, on July 1, 1971, Smith's wife, Vernita, found him unconscious. Smith was hospitalized at Women's Medical College Hospital in a comatose state which had resulted from an overdose of sleeping pills. Smith's stomach was pumped and he was also treated for a cut on his wrist which had resulted from the first attempted suicide. Smith remained in this hospital overnight but, on July 2, 1971, at 1:00 p. m., Smith discharged himself against the advice of the hospital personnel.

Thereafter, Vernita took Smith to her grandmother's residence where he remained for three to four hours during which time he evidenced nervousness although he slept for a brief period of fifteen minutes. On the ad-

they were obtained in violation of the mandates of *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972) and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) that the trial court erred in refusing to charge the jury on voluntary manslaughter; (3) that the trial court erred in allowing certain photographs to be admitted into evidence over objection; and, (4) that the trial court erred in allowing certain questions to be asked Smith's wife during cross-examination because the answers resulted in a violation of the mandate of the Act of May 23, 1887, P.L. 158, § 2(b), 19 P.S. § 683, as amended.

vice of his wife, Smith then went to the emergency ward of the Philadelphia General Hospital, where he consulted a psychiatrist. On the advice of the psychiatrist, Smith reported to that hospital's out-patient mental health clinic where he and his wife apparently arranged for future treatments on an out-patient basis. Smith and his wife were then prepared to leave the hospital when the police arrived and arrested Smith for the murder of Jack Broadus on April 24, 1971. The arrest occurred at 1:10 a. m. on July 3, 1971.

Smith was transported to the Police Administration Building where he was placed in an interrogation room at 1:35 a. m. He remained in the room alone and handcuffed to a chair until approximately 2:50 a. m., at which time he was taken to the men's room. He was again placed in the interrogation room at 2:55 a. m. where he remained alone until 3:45 a. m. At that time, Smith was given coffee and a sandwich.

At 4:00 a. m., Officer LaRue warned Smith of his constitutional rights. Specifically, Smith was asked if he wished to remain silent and he responded negatively. But when he was asked:

"Are you willing to answer the questions of your own free will, without force or fear, and without any threats or promises having been made to you,"

Smith responded: "I have nothing to say."[2] Smith was then left alone in the interview room until 9:10 a. m. During the intervening five hours, Smith was handcuffed to a chair. LaRue testified that he looked into the room at various times and observed Smith with his

2. This response was the only response LaRue indicated was given to the question during the suppression hearing. At trial, LaRue stated the response was:

"'Look, I don't have nothing to say.' He says, 'I told you before I didn't know nothing, [Jack Broadus] was my friend, and you better go out and find who did it because I don't know who killed him because I didn't do it.'"

eyes closed. From these observations, LaRue opined that Smith was sleeping.

At 9:10 a. m., Officer Konczyk entered the room, advised Smith of his constitutional rights, and informed him that his brother-in-law, Clarence Hooks, had implicated him in the killing. Smith then implicated himself. Konczyk left the room at approximately 9:30 a. m.

Konczyk returned to the room at 9:55 a. m. and Smith recounted in detail the events and circumstances surrounding the killing. Konczyk left the room at 10:20 a. m. Each of these statements was testified to at trial by Konczyk.

Between 10:35 a. m. and 11:15 a. m., Smith visited with his wife. Between 11:15 a. m. and 1:30 p. m., with the exception of a short period when Smith was taken to the men's room, after Smith was again warned of his constitutional rights, he recounted the events and circumstances of the killing. The questions and answers were typed and each page was signed by Smith at approximately 1:15 p. m. This written statement was also introduced at trial.

Smith had a ninth grade education and could read and write. The police also testified that Smith acted depressed while in custody, that is, he continuously kept his eyes on the floor; but the testimony also stated he was alert and coherent when questioned.

Additionally, the police involved were aware of the fact that Smith had made attempts at suicide, that he had been hospitalized because of the attempts, and that he made arrangements for out-patient care. Indeed, the police after the incriminating statements were taken recommended Smith be sent to the prison hospital rather than to normal confinement areas. Finally, Smith was also aware of the fact that his wife was in custody, see infra, and was being questioned with regard to the killing of Broadus.

As we said in *Commonwealth v. Alston,* 456 Pa. 128, 133–34, 317 A.2d 241, 243 (1974):

" . . . the ultimate test for voluntariness is whether the confession is the product of an essentially free and unconstrained choice by its maker. 'If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.' *Culombe v. Connecticut,* supra, 367 U.S. at 602, 81 S.Ct. at 1879 (1961); see also *Commonwealth ex rel. Butler v. Rundle,* supra, 429 Pa. at 149, 239 A.2d 430 (1968); *Commonwealth v. Eiland,* supra, 450 Pa. at 574, 301 A.2d at 654 (1973); *Commonwealth v. Riggins,* supra, 451 Pa. at 524, 304 A.2d at 476 (1973); *Commonwealth v. Banks,* 454 Pa. 401, 407, 311 A.2d 576, 579 (1973). An evaluation seeking to determine whether a confession is involuntary because of psychological coercion must consider those elements impinging upon a defendant's will such as: the duration, and the methods of interrogation; the conditions of detention, and the manifest attitude of the police toward the defendant, the defendant's physical and psychological state and all other conditions present which may serve to drain one's powers of resistance to suggestion and undermine his self-determination. See *Culombe v. Connecticut,* supra, 367 U.S. at 602, 81 S.Ct. at 1860; *Commonwealth ex rel. Butler v. Rundle,* supra, 429 Pa. at 151, 239 A.2d at 431; *Commonwealth v. Eiland,* supra, 450 Pa. at 574, 301 A.2d at 654; *Commonwealth v. Riggins,* supra, 451 Pa. at 525, 304 A.2d at 476; *Commonwealth v. Banks,* supra, 454 Pa. at 407, 311 A.2d at 579. As we have noted, when the question of

voluntariness passes beyond the realm of physical coercion and into degrees of psychological coercion, most careful attention will be afforded to any facts, circumstances or events tending to overbear the will of the accused. *Commonwealth ex rel. Butler v. Rundle,* supra, 429 Pa. at 149, 239 A.2d at 430."

Instantly, the conditions of detention included a minimum of eight hours of being handcuffed to a chair and isolated from other persons with the exception of limited encounters with police. Smith's physical and psychological state was obviously deteriorated as evidenced by his attempts at suicide, his recent discharge from the hospital, and the police recommendation that he be hospitalized following the detention for interrogation purposes.

Further, while the element of continuous interrogation is not present so that the length of time between arrest and the obtaining of the statements in itself is not sufficient to warrant reversing the court's determination of voluntariness, *Commonwealth v. Johnson,* supra, 467 Pa. at 155, 354 A.2d at 890–91, the length of detention, some eight hours, must instantly be considered in connection with Smith's obviously impaired mental state. Moreover, five of the eight hours must be viewed as having occurred subsequent to Smith having expressed a desire to remain silent.[3] That Smith's will was impaired by his mental condition is further evidenced by the fact that even without prolonged detention he acted against his own best interests when he discharged himself from the hospital on July 2 against the advice of medical personnel.

3. The testimony at the suppression hearing clearly established this, supra n. 2 and accompanying text, and our standard of review presents a serious barrier to considering the additional testimony provided at trial in explanation of what was said at 4:00 a. m. But we need not now determine if we should consider the further explanation provided at trial because, even assuming we should or would, we would still consider the confession involuntary under the totality of the circumstances involved herein.

■ Thus, considering the length of detention, the circumstance of isolation and being handcuffed to a chair, Smith's knowledge that his wife was in custody and being questioned, and very importantly, Smith's mental state as evidenced by his attempts at suicide and need for medical attention, we hold that evidentiary use of the statements should not have been permitted at trial because the Commonwealth failed to establish they were voluntarily given. Accordingly, a new trial is required.

But since a new trial is required, in the interest of advancing the efficient administration of justice, we shall consider one other assignment of error which will undoubtedly be pertinent to the new trial. Smith argues permitting the introduction of certain evidence at trial by the Commonwealth was error because it was obtained in violation of his right to be free from unreasonable searches.[4]

The evidence was obtained during a warrantless search of Smith's residence. The Commonwealth argues the search was legal because Smith's wife, Vernita, consented to the search.

It is well-established that a warrantless search is not violative of the fourth amendment where consent to search is obtained. *Commonwealth v. Boyer,* 455 Pa. 283, 314 A.2d 317 (1974); *Commonwealth v. Biebighauser,* 450 Pa. 336, 300 A.2d 70 (1973); *Commonwealth v. Harris,* 429 Pa. 215, 239 A.2d 290 (1968). Furthermore, Vernita undoubtedly had the capacity to provide consent because she had an equal right to use and occupy the premises searched. *Commonwealth v. Biebighauser,* supra; 1 Wharton, Criminal Procedure 390, § 182 (12th ed. 1974). But in order for a consensual search to be constitutionally permissible, the Commonwealth must establish the consent was effective, that is, voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041,

4. A motion to suppress this evidence was overruled.

36 L.Ed.2d 854 (1973); *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972); *Commonwealth v. Harris*, 429 Pa. 215, 239 A.2d 290 (1968). Voluntariness is a factual conclusion to be determined from all of the circumstances. *Schneckloth v. Bustamonte*, supra. The circumstances must show that the consent was freely given and was not the result of duress or coercion, that is, there must be a "total absence of duress and coercion, expressed or implied." *Commonwealth v. Mamon*, supra, 449 Pa. at 256, 297 A.2d at 474, quoting from *Commonwealth v. Harris*, supra, 429 Pa. at 221, 239 A.2d at 293. Finally, in resolving the issue, since the suppression court concluded the consent to be voluntarily given, we must consider the Commonwealth's evidence and so much evidence presented by Smith as remains uncontradicted, *Commonwealth v. Johnson*, supra, to determine if the evidence supports the court's conclusion. So viewed the evidence establishes the following:

Vernita accompanied her husband to the Police Administration Building when he was arrested at 1:00 a. m. on July 3, 1971. While there she was questioned numerous times after having been given *Miranda* warnings. And while one officer testified that she was free to leave at any time she wished, he did not contradict her testimony which established that she was locked in a room during the time she was at the Police Administration Building before she affirmatively indicated her consent. Under such circumstances, we must consider the effectiveness of the consent as if given while in custody.

 Custody, while not determinative in itself, places a heavy burden in showing consent was voluntarily given. See *Judd v. United States*, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951); *United States v. Page*, 302 F.2d 81 (9th Cir. 1962); 9 A.L.R.3d 877, § 6(b)(c). Furthermore, custody when coupled with other coercive factors will normally necessitate the conclusion that the consent is not effective. Instantly, the *only affirmative indica-*

*tion* of consent which Vernita gave was given after she was in custody for approximately twelve hours and after she had been questioned by police numerous times. *State v. Kananen,* 97 Ariz. 233, 399 P.2d 426 (1965); *Judd v. United States,* supra; *Greenwell v. United States,* 119 U.S.App.D.C. 43, 336 F.2d 962 (1964). Cf. *Commonwealth v. Boyer,* supra. Further, she consented only after she learned her husband had confessed to the murder and we have now determined that confession was involuntary. Finally, while the search involved was not actually conducted until July 7, 1971, and Vernita was not in custody at the time of the search and cooperated fully with the police conducting the search, it is apparent from the record that she was merely acquiescing in police directives at the time and nothing in the record shows any affirmative indication of consent other than that obtained on July 3, 1971. See *Commonwealth v. Mamon,* supra; *Commonwealth v. Harris,* supra. Cf. *Commonwealth v. White,* 459 Pa. 84, 327 A.2d 40 (1974).

■ Thus, considering the fact of custody, the length of time Vernita was in custody, the questioning during that time, and the obtaining of consent from her only after her husband had provided a confession which we today hold was involuntarily obtained, the consent can hardly be said to have been obtained in circumstances showing "total absence of duress and coercion, expressed or implied." *Commonwealth v. Harris,* supra, 429 Pa. at 221, 239 A.2d at 293. We hold that under the circumstances the Commonwealth has failed to establish that the consent was voluntarily obtained and hence, the challenged evidence should have been suppressed.

Accordingly, the judgment of sentence is reversed and a new trial is granted.