UNITED STATES of America, Plaintiff,

v.

Carmine CRISCONI, Jr., Defendant.

Crim. A. No. 81–15.

United States District Court,
D. Delaware.

Aug. 19, 1981.

Joseph J. Farnan, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Joseph A. Hurley, Paul & Hurley, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge.

For several months beginning in July of 1980, a Federal Grand Jury conducted an investigation into allegations of extortion by city building department inspectors in Newark, Delaware. One of the Government's sources of information about the alleged payoffs was Carmine Crisconi, Jr., a Newark contractor. Although the Grand Jury has not indicted anyone for violations arising out of the subject matter of that investigation, Crisconi himself has been charged with perjury before the Grand Jury, in violation of Title 18, United States Code, Section 1623. Count One alleges that Crisconi impeded the Grand Jury's investigation by testifying falsely about the date on which he received a letter relating to an alleged payoff. In Count Two the Grand Jury charges that Crisconi perjured himself by making two irreconcilably inconsistent statements pertaining to a date stamp impressed on that same letter.

Defendant has moved to dismiss the indictment, claiming that it was obtained by prosecutorial misconduct. He also requests dismissal on the ground that the testimony was not material to the Grand Jury's investigation. As a third basis for dismissal, he asserts that the statements in Count Two are not irreconcilably inconsistent with one another. On June 15, 1981, the Court held an evidentiary hearing on Defendant's claim of abuse of the Grand Jury by the Assistant United States Attorney ("AUSA"), who conducted the investigation. This Opinion incorporates the Court's Findings of Fact and Conclusions of Law.

## I  THE FACTS

In March of 1980, the Defendant disclosed to agents of the FBI that officials in the Newark city Building Department had obtained payoffs from contractors in exchange for favorable inspection reports. Crisconi represented to the agents that he had acted as a conduit for payments to corrupt officials, and agreed to cooperate in an investigation. In August of 1980, Crisconi twice met with AUSA Edmund D. Lyons, Jr. The Defendant repeated allegations concerning illegal activity in the Newark city government.

Lyons assured Crisconi that he was not a target of the investigation, so long as the information he provided to the Government was truthful. After meeting with Lyons, Crisconi retained Carl Schnee, Esquire, to represent him in connection with his testimony before the Grand Jury. Schnee met with Lyons soon thereafter. Although Lyons reaffirmed that Crisconi was not a target of the Grand Jury's inquiry, he declined to reveal details of the investigation.

A second meeting between Schnee and Lyons on September 22, 1980 yielded similar results. Lyons refused to produce copies of Crisconi's prior statements, but told Schnee that Crisconi would not be prosecuted if he cooperated. If, however, it appeared that Crisconi had not merely been the agent of corrupt city officials, but had in fact appropriated the payoff money for himself, Lyons warned, the informal immunity agreement would no longer be valid. Lyons also advised Schnee that he believed Crisconi had played a larger role in the payoff operation than he had led the FBI to believe.

On the advice of counsel, Crisconi refused to appear before the Grand Jury without a formal grant of immunity. On October 22, 1980, Judge Latchum granted Crisconi immunity pursuant to 18 U.S.C. §§ 6002 et seq. Crisconi appeared before the Grand Jury the following day, and again on November 3, 1980. On both occasions Crisconi testified about an alleged payoff by the owners of Winston's Restaurant to Newark building officials in order to evade a requirement that they install an expensive sprinkler system in the restaurant building.

The truthfulness of Crisconi's testimony about the Winston's transaction is the heart of this case. The principals of Winston's told the Grand Jury that they had given Crisconi the money to pay off the building officials in April of 1978. A letter, from the Assistant Director of the Newark Building Department, dated January 12, 1978, addressed to Crisconi at his office, indicates that a sprinkler system would not be required in the restaurant if certain other, presumably less expensive, fire prevention measures were taken. Since this letter appears to have been the *quid pro quo* for which the alleged bribe was offered, it was important to know whether Crisconi had learned of the letter before the Winston principals claimed that he approached them in connection with the bribe or afterwards. If he knew the permission sought from the Building Department had already been granted when he approached the Winston principals, it would, of course, be far more likely that he was acting on his own behalf rather than simply as a conduit for the accused building officials.

On October 23, Crisconi identified the letter (Grand Jury Ex. CC–5) and originally indicated that he had received it sometime shortly after January 12.*

On November 3, Mr. Lyons again inquired about the January 12 letter. Crisconi reaffirmed that he had made a $5,000 payoff to City building officials before receiving the letter. Although the questioning did not elicit details about the dates of the payoff and the letter, Crisconi implicitly testified that he had received the letter in or around January of 1978. (GX 2 at 19–20)

AUSA Lyons doubted the reliability of Crisconi's testimony about the Winston's payoff, which contradicted other testimony before the Grand Jury by Winston principals, as well as documentary evidence. He conveyed doubts about Crisconi's credibility to Schnee. Crisconi had offered to submit to a polygraph examination in November, and Lyons decided to accept the offer in early December 1980. On December 31, Schnee informed Lyons that he had advised Crisconi not to undergo a polygraph test.

At Lyons's direction, a second Grand Jury subpoena issued in mid-December, 1980. At a meeting with Schnee on January 5, 1981, Lyons indicated that he intended to "clear up" inconsistencies in Crisconi's prior testimony during Crisconi's appearance scheduled for January 14. Lyons warned that he "believed that Crisconi had lied to the Grand Jury and that [he] would take as long as necessary in the Grand Jury to pin him down to expose any such falsehood. [H]e concluded by telling Mr. Schnee that if Mr. Crisconi were lying that he was making a mistake." Lyons Affidavit ¶ 14, DX 7.

On January 12, Defendant filed a Motion to Quash the Subpoena as an abuse of

---

* The entire colloquy was as follows:

Q If you will look at page 45 of the exhibit, you will see the now famous letter of January 12, 1978.
A Right.
Q You have seen this letter before?
A Yes.
Q This letter was written to you from Mr. Edwards. Is that right?
A Right.
Q And, in effect, this letter says that only a partial system need be installed in the restaurant, partial sprinkler system.
A Right.
Q Which is different than what the building permit says.
A Right.
Q Did you receive the original of this letter?
A I would say, yes, sir.
Q Was it mailed to you?
A Yes, sir.

Q When did you receive the original of this letter?
A I can't recall. I assume somewhere around January 12.
Q You certainly did not receive it at some later date then realize the letter had been back-dated?
A I wouldn't know, to be honest with you.
Q You didn't receive it in April and look down at the date of the letter and say, I didn't see this before. This letter is dated in January. That did not happen, did it?
A I don't think so.
Q You received this letter sometime shortly after the date of the letter?
A Right.
Minutes of Testimony Before the Grand Jury, October 23, 1980, GX 1 at 63. Crisconi gave a slightly different account later the same day. (GX 1 at 96–98).

Grand Jury process, seeking, in the alternative, production of a transcript of his previous testimony. (DX 7). Judge Latchum denied the Motion in an Order dated January 13, 1981.

Crisconi appeared and testified before the Grand Jury on January 14. He stated that he had not in fact received the letter dated January 12, 1978 before the federal investigation began, although it might have been delivered to his office. He indicated that the letter had come into his office without his ever having read it. (GX 3 at 12–13). Crisconi was recalled to complete his testimony on January 27. In this, the Defendant's last appearance before the Grand Jury, Lyons probed Crisconi's recollection of the January 12 letter in detail.

On January 5, after his discussion with Mr. Schnee, and again on January 15 Lyons expressed his disbelief of Crisconi to the Grand Jury. His objective, he explained, in recalling Crisconi was to "pin him down," because:

> the law says, look, if you've got a guy that you think is not telling the truth, then you ought to do something about it at a later date, such as recommend a perjury prosecution to a Grand Jury, you have to make one hundred percent sure that there is no misunderstanding between you and him and that he understood the questions, and that he didn't have any questions about what you were getting at. So, if he persists, then I'm just going to try to pin him down as quickly but as thoroughly as I can.

DX 5 at 3.

At the evidentiary hearing on Crisconi's Motion to Dismiss the indictment against him, AUSA Lyons testified that he thought that Crisconi had been less than candid during his first meetings with Lyons in August of 1980, and that his responses to questions before the Grand Jury were not entirely truthful. He also testified that because Crisconi was a crucial witness, that it was vital to the Grand Jury's investigation to obtain a consistent and truthful account of the Winston's payoff from Crisconi before indicting anyone implicated in the alleged payoff scheme. According to Lyons, he "wanted to make [Crisconi] choose between telling the truth and telling a prosecutable lie."

Lyons admitted that he considered the Defendant to be "slippery" and "savvy," and that he was "playing hard ball" in his interrogation. But he also offered Crisconi numerous opportunities to recant prior testimony. (GX 3, pp. 4, 11, 46, 62; GX 4, pp. 26–27). Lyons resolutely denied that he had called Crisconi before the Grand Jury to entrap him into committing perjury. I found that testimony credible, and entirely consistent with that offered by the defense.

Carl Schnee testified that Lyons told him on January 5, 1981, that a perjury indictment was a real possibility. Although I credit this testimony, I do not find it inconsistent with Lyons's assertion that his primary objective was to obtain truthful testimony from Crisconi which would assist the Grand Jury in its investigation of political corruption in Newark.

Testimony on the Hobbs Act violations continued through April 23. Another AUSA, John X. Denney then presented the instant indictment; the Grand Jury returned a true bill against Crisconi for perjury on the same day.

## II INDICTMENT DEFICIENCIES

### COUNT I

The Defendant challenges Count I of the indictment on the ground that it fails to allege the materiality of the allegedly perjurious statement. I am unpersuaded.

■ Materiality is an essential element of a violation under 18 U.S.C. § 1623; it is a question of law for the Court. *United States v. Crocker*, 568 F.2d 1049, 1051, 1056 (3d Cir. 1977). "[A] perjurious statement is material . . . if it has a tendency to influence, impede, or hamper the Grand Jury from pursuing its investigation." *United States v. Lardieri*, 497 F.2d 317, 319 (3d Cir. 1974).

■ The Grand Jury which subpoenaed Crisconi was investigating whether payoffs

had been made to public officials in violation of the Hobbs Act. The indictment alleges that Crisconi testified, during his initial appearances before the Grand Jury on October 23 and November 3, 1980, that he had received the payoff from the principals of Winston's before receiving the letter that was dated January 12, 1978, while the Winston's principals testified that this delivery was not made until on or after April 7, 1978. The indictment also alleges that the letter to Crisconi, said by him to be the *quid pro quo* for the payoff, was dated January 12, 1978 and bore a "Received" stamp of January 16, 1978. If Crisconi, as he testified at his initial appearances, had received the money before he received the letter, his story that he was merely a conduit was a coherent one. If, on the other hand, he became aware of the letter in January and did not receive the payoff money until April, that fact would cast grave doubt upon his story and, indeed, suggest that he may have pocketed the money himself. For this reason, the Grand Jury, on January 27, 1981, had a compelling interest in determining the date on which the letter was first seen by Crisconi particularly because it related to the date of the alleged payoff. In this context, the indictment alleges that Crisconi testified falsely that he had no memory as to whether he had seen the letter before it was shown to him by the Government in August of 1980 and that this falsehood hindered the Grand Jury's efforts "to determine the approximate date on which Crisconi first received or otherwise became aware of the existence of" the letter. On this basis, I conclude that the indictment alleges the materiality of the allegedly perjurious statement.

## COUNT II

■ Count II of the indictment charges Crisconi with a violation of 18 U.S.C. § 1623(c), which allows prosecution for statements "which are inconsistent to the degree that one of them is necessarily false." The issue, then, is whether the two statements alleged in Count II of the indictment are inconsistent to such a degree.

The indictment alleges that Crisconi gave the following testimony on November 3, 1980:

Q  You will see before you, I think you have it in your hand right now, a document which I have marked for the record as CC–5, which appears to be the original of a letter dated January 12, 1978. I don't believe the members of the grand jury have a copy of that letter. This is the letter which was sent from Bob Edwards to you and related to the sprinkler system at the Restaurant. Isn't correct?

A  The one I have in front of me?

Q  Yes, sir.

\*     \*     \*     \*     \*     \*

Q  Now, you see a stamp that appears on the upper right-hand corner of the first page of that letter, a Received stamp?

A  Yes, sir.

Q  What date appears in or underneath the Received stamp?

A  January 16, 1978.

Q  Do you recognize that Received stamp as it appears on that letter?

A  Not offhand, no sir.

Q  Do you recall having such a stamp at your offices at, what was it, 174 Elkton Road?

A  There could have been one in there. I don't recall.

Q  You don't have any specific recollection?

A  No, not of that stamp.

The allegedly inconsistent testimony came in the following exchange on January 14, 1981:

Q  Sir, take that stamp in front of you, CC–7, do you recognize that stamp?

A  It looks like a typical office stamp.

Q  Have you seen that particular stamp before?

A  I don't know if I've seen this, but I have seen stamps that look like this, yes.

Q  Have you seen a stamp similar in appearance to that stamp?

A   Yes, sir, we used to have one like this, either this or one similar to it in our office.

It is clear from the face of the indictment that the November 3rd discussion was about an impression made by an office stamp, while the January 14th discussion concerned an office stamp of the kind used to make such impressions. The fact that Crisconi on November 3rd had no specific recollection of the impression "as it appears on that letter," if true, does not make "necessarily false" the proposition that Crisconi, on January 14th, thought the stamping device shown to him was similar to one which had been in his office. Count II, accordingly, will be dismissed.

### III   PROSECUTORIAL MISCONDUCT

■   Crisconi asserts three grounds in support of his contention that the Government's conduct in connection with the Grand Jury proceedings deprived him of due process of law. His first claim is that the Government utilized the Grand Jury process in January of 1979 solely for the purpose of getting him to commit perjury. Second, Crisconi argues that the Government should have granted his request for transcripts of his prior testimony when it recalled him in January 1981. Finally, it is said that AUSA Lyons violated Crisconi's Fifth Amendment rights when he offered the Grand Jury his opinions on Crisconi's credibility. I address each of these contentions in turn.

Crisconi's initial charge is that "it is an abuse of the Grand Jury process for the Government to utilize the legitimate Grand Jury investigatory function as a 'schill' for the securing of an indictment for perjury on matters which are not germane to the Grand Jury function." (Defendant's Brief at 20). Defendant's statement of this rule is supported in the case law. *See Bursey v. United States*, 466 F.2d 1059, 1080 n.10 (9th Cir. 1972); *Brown v. United States*, 245 F.2d 549 (8th Cir. 1957).

From the Grand Jury transcripts and the testimony at the June 15th hearing, however, I conclude that these are not the fac-

tual circumstances of the instant case. First, as noted above, the matters about which Crisconi was questioned, were clearly material to the Grand Jury's investigation. Second, there is ample evidence that Lyons's purpose in the repetitive questioning of Crisconi was just as he explained it—to force a witness whose story was inconsistent with that of other witnesses to tell the truth or be faced with a prosecutable lie. That Lyons was interested in obtaining truthful testimony if possible is supported by his focusing the defendant's attention on prior inconsistencies and by his numerous offers to the Defendant to recant any prior testimony (GX 3, pp. 4, 11, 46, 62; GX 4, pp. 26–27). In addition, that the Grand Jury was not used as a "schill" for securing a perjury indictment against Crisconi is also demonstrated by the fact that the Grand Jury continued to take testimony relating to the substantive Hobbs Act violations until April 23, well beyond Crisconi's last appearance before the Grand Jury on January 27th. I find no impropriety in Crisconi's being summoned back to the Grand Jury in January or his being subjected to the questioning which went on at that time.

■   While Crisconi's second argument is cast in terms of prosecutorial misconduct, it is, of course, clear that the Government had no authority to provide him with Grand Jury transcripts absent Court approval under Rule 6(e). Accordingly, the problem, if there is one, is with this Court's denial of his prior request for transcripts of his own testimony. In this regard, I do not understand the Defendant to contend that Judge Latchum's original order denying his request for transcripts of prior testimony was erroneous; rather, he asserts that, given our present knowledge of the Government's purpose and conduct, the Government's failure to provide the prior transcripts was a denial of his due process right. The short answer to this assertion is that the materials before Judge Latchum disclosed the Government's purpose and conduct to be the same as I have found them to be on the basis of the July 15th hearing. They like-

wise revealed the same contentions on the part of Crisconi.

Crisconi's argument regarding his demand for transcripts is fatally flawed, in any event, by the absence of any causal connection between the deprivation of right he claims and the indictment which he attacks. The essence of Crisconi's claim of need for the prior transcript is that the Government was able to take advantage of him, an unwary and unprepared witness, who could not legitimately be expected to remember his previous testimony. *See U.S. v. Clavey*, 565 F.2d 111 (7th Cir. 1977), *aff'd by an equally divided court on rehearing en banc*, 578 F.2d 1219, *cert. denied* 439 U.S. 954, 99 S.Ct. 351, 58 L.Ed.2d 345 (1978); *In Re: Braniff Airways, Inc.*, 390 F.Supp. 344 (W.D.Tex.1975). The Grand Jury transcripts and the testimony at the June 15th hearing, however, belie these assertions. Unlike *Braniff*, for example, in which there had been no suggestion of prior untruthfulness by the witnesses, in this case, Lyons specifically warned Crisconi and his attorney Schnee that at least parts of Crisconi's prior testimony were not believable and he could be prosecuted for perjury. (6/15 Transcript at 3–4). Importantly, in both January appearances, including directly before he made the statement for which Count I of the indictment charges him for perjury, when Crisconi was questioned about the time of receipt of the letter, he was reminded of his earlier testimony about the same event and given the opportunity to recant. (GX 3 at 35–43; GX 4 at 27–34). Thus, so far as the subject matter of the remaining count of the indictment is concerned, Crisconi is in no different position today than he would have been in if this Court had ordered the production of transcripts before his January appearances.

Finally, Defendant claims that several statements by AUSA Lyons indicating that he believed Crisconi was lying prevented the Grand Jury from being unbiased, and thus deprived Crisconi of the "fundamental fairness" he is entitled to under the Due Process Clause.

In defining the boundaries of proper prosecutorial conduct before the Grand Jury, courts have looked to the American Bar Association Standards Relating to the Prosecution Function. *See United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979); *United States v. Birdman*, 602 F.2d 547 (3d Cir. 1979). Section 3.5(a), states that "[T]he prosecutor . . . may appropriately explain the law and express his opinion on the legal significance of the evidence but he should give due deference to the Grand Jury's status as an independent legal body." In this case, AUSA Lyons's conduct, in context, held considerably less potential for subverting the independence of the Grand Jury than the conduct of the prosecutor in the cases cited by Crisconi. A reading of the Grand Jury transcripts convinces me that the potential jeopardy to Grand Jury independence does not warrant the radical response suggested by the Defendant.

In the course of the proceedings, Lyons did express to the members of the Grand Jury his belief that Crisconi was not telling the whole truth. These expressions of misgiving came in a context unlike that involved in most cases where prosecutorial misconduct is claimed, however. Lyons was speaking not of the target of the Grand Jury's investigation, but about someone upon whose testimony the Government's case would rise or fall in the event an indictment were returned. Accordingly, this is not a case where a prosecutor was expounding on his own views in order to prod a reluctant or unconvinced Grand Jury into action.

Moreover, the challenged observations were not made in the course of urging the Grand Jury to take any particular action. They were made in the course of an analysis of the evidence before the Grand Jury, of the possible inferences that could be drawn from that evidence, and of the alternative courses available to it in pursuing its investigation. The Grand Jury had reached a point where it had heard conflicting testimony regarding the alleged payoffs and the Grand Jury had to decide how to proceed. In this context, Lyons made the following

remarks, which are typical of that challenged commentary:

Those of you who were here during his testimony may recall that he is very adept at slipping and sliding when you try to really pin him down and it is necessary for me to get him committed to a particular version of the facts, whatever they may be. We are not doing our job if we let him answer our questions with, well, I think it was A, B, or C, and I don't really recall anyway. So, one thing I've got to do is pursue that with him and pin him down in certain areas. The biggest area that I'm really concerned about is that letter. That is the letter dated January 12, 1978, which bears a received stamp of several days later. Well, I know you all remember that the Winston people said that they made the payoff in April and they've got the documents to back themselves up. Why were they making a payoff if that letter had been sent out several months earlier?

That seems to be where we are. When we asked Crisconi about that he said we got the letter after the payoff. So, there's a real big question about which came first, the letter or the payoff. I think that he may have had that letter and held it back and then gone out for whatever reason and hit these people for—whether it was 2,000 or 5,000, I don't know. The Winston people said 2,000. But at any rate, I want to explore with Crisconi, I want to pin Crisconi down in that area.

DX 4, pp. 2–3.

Three other factors also deserve to be noted. First, Lyons's remarks throughout the remainder of the investigation did not rule out the possibility that Crisconi might be telling the truth.** Second, those remarks were based solely on an analysis of the evidence which the Grand Jury had itself heard; Lyons did not purport to have any additional information bearing on the subject of Crisconi's veracity. Accordingly, the Grand Jurors were in a position to

independently evaluate his opinion. Finally, I note that when the focus of the Grand Jury's attention was to be turned from the existence of Hobbs Act violations to the issue of whether Crisconi should be indicted for perjury, a new prosecutor, John Denney, was assigned to assist the Grand Jury with the matter. With a new prosecutor and with the members of the Grand Jury having themselves witnessed the alleged perjury, I consider it highly unlikely that the comments of AUSA Lyons in the course of the Hobbs Act investigation had any impact on the indictment of Crisconi.

## IV CONCLUSION

For these reasons, Defendant's Motion to Dismiss Count I will be denied, and his Motion to Dismiss Count II will be granted.

---

** On February 19, 1981, for example, Lyons told the Grand Jurors "I'm pursuing the case from two different angles, one, is Crisconi telling the truth and two is . . . ." (GX 15 at 8–9).