565 A.2d 160

## COMMONWEALTH of Pennsylvania

v.

## Terrance WILLIAMS, Appellant.

Superior Court of Pennsylvania

Argued May 25, 1989.

Filed Sept. 25, 1989.

---

154

Michael J. Healey, Pittsburgh, for appellant.

Kemal A. Mericli, Asst. Dist. Atty., Pittsburgh, for Com.

Before OLSZEWSKI, MONTEMURO and KELLY, JJ.

OLSZEWSKI, Judge:

This is an appeal from the judgment of sentence entered by the Court of Common Pleas of Allegheny County after conviction for delivery of a controlled substance and two counts each of perjury and false swearing. On appeal four issues are raised: first, whether the Commonwealth engaged in misconduct consisting of setting a perjury trap for an uncounseled target of a grand jury; second, whether the evidence was sufficient to sustain one of the counts of perjury; third, whether one of the Commonwealth's witnesses voluntarily consented to allow his conversations with appellant to be tape recorded; and fourth, whether there was sufficient evidence to sustain the verdict as to possession of heroin with intent to deliver. For the following reasons, we affirm.

The facts of the crimes underlying the convictions in this case center around the demise of one Isaac "Toddy" Dunning. Mr. Dunning had been shot to death, presumably at the behest of one Alvin "Pons" Frazier, on June 14, 1985, in the Hill District section of Pittsburgh. A subsequent investigation by Detective Terrance O'Leary of the Pittsburgh Police Department led to a primary suspect, Melvin Kessler, a friend of appellant's. Both Kessler and appellant alleg-

edly sold heroin for Alvin Frazier. Upon questioning by Detective O'Leary, appellant claimed that he had not seen Dunning, nor Kessler, on the day of the killing, but that he had been at his mother's home around the time Dunning was shot.

Dunning had been close friends with one Coty Youngblood. While Youngblood was serving a sentence in Allegheny County Jail, he had heard about Dunning's death. On the premise of assisting the police in catching those responsible, Youngblood contacted the District Attorney's Office to offer his help.[1] In this regard, Youngblood, who was an acquaintance of appellant, agreed to set up a meeting with appellant at a hotel in the Oakland section of Pittsburgh and to have the conversation tape recorded.

On July 31, 1985, during one of these meetings between Youngblood and appellant, the conversation turned to drugs.[2] Appellant stated that he was waiting to get some heroin. Later that same evening, appellant brought three balloons of the drug to Youngblood's room and split these with the witness. After appellant had left the room, Youngblood gave the heroin to Detective O'Leary who then bagged, marked, and ultimately sent the drug to the Allegheny Crime Lab.

On August 29, 1985, appellant appeared under subpoena before the Allegheny County Investigation Grand Jury, which had been convened to investigate the death of Isaac Dunning. During that proceeding, appellant denied being in the presence of Dunning or Kessler on the day of the

1. According to the record, Youngblood was serving both state and federal sentences while housed at the Allegheny County Jail. Apparently he was experiencing a problem with regard to the time remaining on each sentence before he would be eligible for parole. In the hopes of rectifying the situation, he first contacted the District Attorney's Office sometime prior to the death of Dunning, then again shortly after. Appellant claims that the eventual sorting out of the sentencing problem was a favor in return for Youngblood's assistance.

2. Present at the hotel room was a woman posing as the companion of Youngblood. Youngblood claims that it was his idea to bring a woman along to make the situation appear normal. Appellant claims that this was another gift in return for Youngblood's assistance.

killing. He also denied being present at, or being involved in, the beating of one William "Deuce" Kerley.[3]

At the close of the grand jury investigation, appellant was charged in an eight-count information filed November 8, 1985. Among the crimes were: one count of criminal conspiracy to commit homicide, 18 Pa.C.S.A. § 903(a)(1); one count of delivery of a controlled substance, 35 Pa.C.S.A. § 780–113(a)(30); three counts of perjury, 18 Pa.C.S.A. § 4902(a); and three counts of false swearing, 18 Pa.C.S.A. § 4903(a)(1).

Various motions to dismiss and/or suppress on grounds of prosecutorial misconduct, government overreaching, and entrapment were filed on all counts, as were petitions for writ of habeas corpus. After hearing and argument on the motions, the trial court, on November 18, 1986, dismissed the charge of criminal conspiracy.[4] On December 4, 1986, the trial court dismissed one count each of perjury and false swearing.[5] All other motions were denied.

On December 2, 1986, appellant was tried non-jury on the remaining two counts each of perjury and false swearing. He was convicted on December 9, 1986, on all counts. Appellant was then tried non-jury for the charge of delivery of a controlled substance, which had been severed at his request, on December 17, 1986. He was convicted of that charge on December 18, 1986. Timely post-trial motions were filed and denied with appellant receiving a sentence of three-to-seven years for the perjury conviction to run con-

3. Kerley, a heroin addict, was allegedly robbing drug dealers working for "Pons" Frazier. In return, Frazier allegedly ordered appellant and Kessler, both of whom had recently begun selling drugs for Frazier, to take care of Kerley. Apparently, Frazier had originally wanted Kerley dead; however, because appellant was friends with Kerley, he was "merely" beaten instead.

4. Appellant was charged with this count based on the grand jury testimony of David "Bus" Cunningham. Cunningham, an alleged enforcer for "Pons" Frazier, testified that appellant and Melvin Kessler were involved in the killing of "Toddy" Dunning. He later recanted this testimony, resulting in the dismissal of the conspiracy charge.

5. These counts were in relation to appellant's alleged denial at the grand jury that he delivered heroin to Coty Youngblood.

secutive to a three-to-six year term on the heroin conviction. No penalty was imposed on the remaining counts. After a hearing on appellant's motion for reconsideration, the sentence on the heroin charge was reduced to a term of two-to-six years. Appellant then filed the instant appeal.[6]

Appellant first argues that the convictions for perjury and false swearing should be reversed because the Commonwealth engaged in misconduct by bringing the appellant before the grand jury with the primary purpose of extracting perjured testimony from him. In support of this argument, appellant contends that he had already been asked by Detective O'Leary the precise question of whether he had been with Dunning and Kessler on the day of the shooting and that he had responded in the negative. He alleges that as the Commonwealth knew what his answer would be in advance, and because the Commonwealth was prepared with witnesses which would testify that appellant had been with Kessler and the victim, the Commonwealth had therefore set a "perjury trap" for him. This being the case, appellant further contends that it was improper for the Commonwealth to allow him to testify uncounseled and non-immunized in a proceeding where he was a "target" and not merely a witness.

The Commonwealth responds by claiming that no government misconduct occurred. It argues that appellant has failed to show that he was a "target" or was misled as to his status before the grand jury. The Commonwealth points to the colloquy between appellant and the supervising judge of the grand jury prior to appellant's testimony. It is stressed that at this proceeding appellant was fully informed as to his rights, and countenanced an understanding of these rights, as well as the penalty for perjured testimony before the grand jury. Accordingly, appellee contends that it did not subpoena appellant for the sole

6. The Commonwealth's brief in this matter was filed approximately two months late, resulting in the loss of oral argument pursuant to Pa.R.A.P., Rule 2188, 42 Pa.C.S.A. After petitioning this Court for leave to make oral argument, however, the Commonwealth was granted permission to argue its case by order dated May 25, 1989.

purpose of extracting perjured testimony as it had reason to expect the witness to testify truthfully regarding any information relevant to the investigation of the homicide of Isaac Dunning. As for its decision not to grant appellant immunity, the Commonwealth posits that immunity is not offered until a witness asserts his Fifth Amendment Rights. In this case, no request was made.

Initially, we note that appellant's claim of a "perjury trap" is unique to this Court, having been addressed only during proceedings involving federal grand juries. Neither appellant nor the Commonwealth base their respective arguments as to this claim on state law, nor could they, for our research indicates a complete lack of case law regarding this issue as it relates to our Investigating Grand Jury Act.[7] In light of this situation, we feel that this specific issue would be more appropriately addressed by examining federal law. Accordingly, we defer to the federal approach.

When addressing a claim of prosecutorial misconduct before a grand jury, our federal courts look first to see whether the alleged misconduct took place, and next, to whether any sanction, such as dismissal of the indictment or suppression of the evidence, is warranted. *United States v. Martino*, 825 F.2d 754 (3d Cir.1987). When dismissal is the requested relief, the federal courts take one of two approaches. The first approach finds dismissal proper where the defendant can show that the conduct of the prosecution caused him prejudice. *The Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Prejudice will have occurred only " 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* at 256, 108 S.Ct. at 2374, 101 L.Ed.2d at 238, *quoting United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50, 61 (1986). Under the second approach, dismissal may be proper where no actual prejudice is shown "if there is evidence that the challenged

7. 42 Pa.C.S.A. § 4541, *et seq.*

activity was something other than an isolated incident un-motivated by sinister ends, or that the type of misconduct challenged has become 'entrenched and flagrant' in the circuit." *United States v. Rosenfield*, 780 F.2d 10, 11 (3d Cir.1985), *quoting United States v. Serubo*, 604 F.2d 807, 817 (3d Cir.1979); *see also The Bank of Nova Scotia*, 487 U.S. at 259–260, 108 S.Ct. at 2376, 101 L.Ed.2d at 240. Under either approach, we must first determine whether any misconduct occurred. We therefore turn to that issue.

■ When conducting a grand jury investigation, the prosecution may not call a witness before the jury with the sole purpose of eliciting perjured testimony. *United States v. Caputo*, 633 F.Supp. 1479 (E.D.Pa.1986), *rev'd on other grounds sub. nom. United States v. Martino*, 825 F.2d 754 (3d Cir.1987). To do so would constitute a violation of a defendant's Fifth Amendment right to due process, *United States v. Simone*, 627 F.Supp. 1264 (D.N.J.1986), as well as an abuse of the grand jury system. *United States v. Crisconi*, 520 F.Supp. 915 (D.Del.1981). Where, however, the prosecutor is aware that a witness may commit perjury, s/he need not refrain from questioning the witness so long as the purpose of the examination is for something other than securing a perjury indictment. *United States v. Chevoor*, 526 F.2d 178 (1st Cir.1976), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1975); *United States v. Nickels*, 502 F.2d 1173 (7th Cir.1974), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). The question then becomes whether another such purpose existed in the present case.

■ Instantly, it is clear that the Commonwealth antici-pated that appellant might or would commit perjury. The statements made by appellant to police regarding his where-abouts shortly after the killing and his involvement in the beating of "Deuce" Kerley were in direct conflict with information already in the hands of the police. While the Commonwealth surely recognized the possibility that appel-lant might perjure himself, we are certain that the ques-tions posed to appellant, though almost identical to those

already asked of him by police, were designed to elicit information regarding the homicide of Isaac Dunning.[8] Truthful answers to these questions could have disclosed information that would have been useful in the pending investigation: first, they would have established that appellant and Melvin Kessler were with Mr. Dunning on the morning of his death, and second, they would have established that appellant and Kessler were employed as "enforcers" for "Pons" Frazier, who had allegedly ordered Dunning killed. Because these questions were relevant to the murder investigation, we are unable to conclude that appellant was subpoenaed for the sole purpose of extracting perjured testimony. *Cf. People v. Tyler*, 46 N.Y.2d 251, 256–258, 413 N.Y.S.2d 295, 297–298, 385 N.E.2d 1224, 1227–1228 (1978) (under New York law, where perjury indictment based on questions irrelevant to underlying investigation, sole purpose of questioning was to extract perjured testimony). Thus, we find no misconduct on the part of the Commonwealth in the questioning of appellant.

■ Nor do we find support in appellant's contention that it was improper for the Commonwealth to allow him to testify uncounseled and non-immunized in a proceeding where he was a "target" and not merely a witness. Prior to testifying, appellant was fully advised of his rights by the supervising judge of the grand jury, the Honorable Alan S. Penkower, as follows:

THE COURT: Each of you has the right to the advice and assistance of a lawyer. That means that you have the right to the services of a lawyer with whom you may consult concerning all matters pertaining to your appearance before the Grand Jury. You may confer with your attorney at any time either before, during or after your testimony. You may consult with your lawyer throughout your entire contact with the Grand Jury; and your lawyer may be present with you in the Grand Jury Room

---

8. In fact, it should be noted that Melvin Kessler was tried and convicted of the killing of Dunning as the result of the information gathered during the grand jury investigation.

during the time that you are actually testifying and you may confer with your lawyer at that time.

If you cannot afford a lawyer, you are entitled to obtain the services of a lawyer appointed by the Court at no cost to you. If you are not eligible for Court appointed lawyer and you wish to retain a lawyer, I would then give you reasonable time to do so. If you have not consulted a lawyer, this does not mean that you are barred from seeking to obtain counsel. Should you change your mind at any time during your testimony, simply advise the District Attorney who is present in the Grand Jury Room that you wish to consult with or retain counsel. In such event, the District Attorney has been instructed by me that any further questioning of the witness shall cease; and the witness shall be excused and a recess declared until the witness has an opportunity to consult with or retain counsel.

You may at any time discuss your testimony with your lawyer and except for cause shown before this Court, you may disclose your testimony to whomever you choose, if you choose.

You have the right to refuse to answer any question pending a ruling by the Court directing you to respond if you honestly believe that there are proper legal grounds for your refusal. In particular, you have the right to refuse to answer any question which you honestly believe may tend to incriminate you.

If you answer some questions or begin to answer any particular question, this does not necessarily mean that you must thereafter continue to answer the questions or even to complete the answers that you have started. Please remember that any answers that you give to any question can and may be used against you either for the purpose of a Presentment by the Grand Jury or criminal prosecution or both.

In other words, if you are uncertain as to whether you may lawfully refuse to answer any question or if any other problem arises during the course of your appearance before the Grand Jury, you have the right to stop

the questioning and appear before me either by yourself or with your lawyer and I will rule on the matter, whenever it may be. Do each of you understand these rights?

\* \* \* \* \* \*

MR. WILLIAMS: Yes.

THE COURT: The duties that you have are fairly simple and straightforward. As a witness before the County Investigating Grand Jury, you have the duty to give full, truthful, complete and honest answers to all questions asked except where you appropriately refuse to answer on a proper legal ground; and hereby directing each of you to observe and obey this duty.

In this regard, I must caution you that if a witness answers untruthfully, he or she may be subjected to prosecution for perjury which is punishable by imprisonment under the Crimes Code of Pennsylvania. Do either of you have any questions in regard to your obligations before the Grand Jury?

\* \* \* \* \* \*

MR. WILLIAMS: No.

Swearing in of the Witnesses Transcript, August 29, 1985, at 5–8.

Appellant argues that despite this extensive colloquy, he was entitled to a warning by the Commonwealth that he was a specific "target" in the investigation of the murder of Isaac Dunning, and further, that he was entitled to counsel and a grant of immunity prior to testifying. We strenuously disagree. Whether appellant was an actual "target" prior to his testimony has not been established on the record in light of the fact that the witness who implicated him, David "Bus" Cunningham, did not testify before the grand jury until two months after appellant. Moreover, even if appellant were a "target", we do not believe that it was required of the Commonwealth to advise him of this fact. As was noted by the Supreme Court in *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238, 246 (1977):

... we do not understand what constitutional disadvantage a failure to give potential defendant warnings could possibly inflict on a grand jury witness, whether or not he has received other warnings. It is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury, and witnesses who are not grand jury targets are protected from compulsory self-incrimination to the same extent as those who are. Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential defendant warnings add nothing of value to protection of Fifth Amendment rights.

Appellant was given the option to acquire the services of an attorney as well as refuse to answer any questions which might incriminate him. Instead he chose to offer perjured testimony. Because he alone made this decision, he cannot be heard to complain. Accordingly, we reject his initial assignments of error.

Next, appellant contends that his conviction for perjury as to his denial that he and Melvin Kessler had beaten William "Deuce" Kerley should be reversed because the Commonwealth failed to show that the statement was material to the homicide investigation. Appellant argues that the beating of Kerley could in no way have affected the outcome of the grand jury investigation as it was wholly unrelated to the homicide of Dunning. We disagree.

In order to constitute the crime of perjury, several elements must be established. One of these is the false testimony be material to the proceeding in which it was made. *Commonwealth v. Lafferty*, 276 Pa.Super. 400, 419 A.2d 518 (1980). On this point, we find guidance in the perjury provisions of our Crimes Code which provide in pertinent part:

§ 4902 Perjury

(b) Materiality.—*Falsification is material,* regardless of the admissibility of the statement under rules of evidence, *if it could have affected the course or outcome of*

*the proceeding.* It is no defense that the declarant mistakenly believed the falsification to be immaterial. *Whether a falsification is material in a given factual situation is a question of law.*

18 Pa.C.S.A. § 4902 (emphasis supplied). The thrust of this standard is whether the misstatement can influence a fact-finder, not whether it actually does. That it *could have* affected the outcome is sufficient. *Commonwealth v. Lobel,* 294 Pa.Super. 550, 440 A.2d 602 (1982); *Commonwealth v. Lafferty,* 276 Pa.Super. 400, 419 A.2d 518 (1980).

■ Utilizing the above standard, it is abundantly clear that appellant's statements were material to the underlying investigation. The grand jury was in the process of investigating the murder of Isaac Dunning. At the time of appellant's testimony, the Commonwealth had evidence that appellant and Melvin Kessler were with Dunning on the day he was killed. Moreover, the Commonwealth also had been made aware that Dunning was afraid of "Pons" Frazier due to a recent falling out between the two. Had appellant been truthful regarding his involvement in or presence at the beating of "Deuce" Kerley, it would have established that Kessler and appellant were enforcers for Frazier as well as provide a motive for the killing. At a minimum, it is certain that the investigation could have been hampered by appellant's lies. We therefore conclude that the trial judge properly found these false statements to be material and we reject any argument to the contrary.

Third, appellant argues that the consent of Commonwealth witness Coty Youngblood to tape record his communications with appellant was not voluntary under the totality of the circumstances. Appellant bases his claim on an assertion that the Commonwealth induced Youngblood to submit to the wiretap by promising to help Youngblood get his sentence straightened out or reduced, and by allowing a female companion to visit and stay overnight while Youngblood was serving a prison sentence. Appellant thereby asserts that the tape recordings were not the product of voluntary consent, and the convictions gotten from their use should be reversed.

With regard to this assignment of error, the Commonwealth counters that the record clearly and unequivocally shows that the witness's cooperation in the recordings was entirely voluntary. Appellee relies on the transcripts wherein the witness testified that the sole reason he consented to the wiretap was that he was a good friend of the victim and that he wanted those responsible caught. He emphatically denied that he was consenting only to receive favorable treatment on his sentence. Moreover, the Commonwealth stresses that use of the female was at the witness's suggestion in order for the meetings to appear more natural, and not a gift to the witness in return for his assistance.

In addressing the consensual interception of communications under the Wiretapping and Electronic Surveillance Act,[9] our Supreme Court has stated:

... for the purposes of 18 Pa.C.S.A. § 5704(2)(ii), one's consent must be given voluntarily in order for the governmental actions to be lawful. *Commonwealth v. Clark,* 516 Pa. 599, 605, 533 A.2d 1376, 1379 (1987), *citing Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977); *Commonwealth v. Mamon,* 449 Pa. 249, 297 A.2d 471.

The voluntariness of one's consent must be the "product of an essentially free and unconstrained choice by its maker ... His will [must not have] been overborne and his capacity for self-determination critically impaired." *Commonwealth v. Clark, supra,* 516 Pa. at 605, 533 A.2d at 1379. *See also Commonwealth v. Smith,* 470 Pa. 220, 368 A.2d 272 (1977); *Commonwealth v. Alston,* 456 Pa. 128, 317 A.2d 241 (1974). Each case must be determined "from the totality of the circumstances." *Clark, supra,* 516 Pa. at 605, 533 A.2d at 1379.

*Commonwealth v. Rodriguez,* 519 Pa. 415, 419, 548 A.2d 1211, 1213 (1988).

**9.** 18 Pa.C.S.A. § 5701, *et seq.*

■ Turning to the facts of the instant case, there can be no doubt that the witness, Coty Youngblood, voluntarily consented to record his conversations with appellant. The witness's testimony at the suppression hearing of April 28, 1986 clearly evidences this. At that hearing the witness testified as follows:

[BY THE PROSECUTION]:

Q. At any rate, did you talk with Detective O'Leary?

A. Yes, I did.

Q. And his partner, Harry Clowes?

A. Yes.

Q. Did you agree to do something specific in terms of helping them out in this investigation?

A. Yes, sir, get the conversation recorded.

Q. At any time in discussing with the Detective the possibility of recording conversations did they threaten you or promise you or coerce you with anything in order to secure your cooperation in taping conversations?

A. No, they didn't.

Q. Did the District Attorney's office, through myself, Mr. Nescott or anyone else, threaten you or coerce you in order to get you to consent to taped conversations?

A. No, you didn't.

\*     \*     \*     \*     \*     \*

Q. Mr. Youngblood, what was the reason why you agreed to do this, to have your conversation taped with Mr. Williams?

A. Because Toddy was a friend of mine, and they murdered him during Ramadan.

Q. Was this a voluntary action on your part?

A. Yes.

Motions Transcript, April 28, 1986 at 10, 13.

Regarding appellant's contention that the witness was induced by the presence of a female, overnight, and the sexual inferences attached thereto, appellant had this to say:

[BY THE PROSECUTION]:

Q. After you asked them if you could have a lady friend of yours come to stay with you and they said what, that this would be possible?

A. That's not exactly how it was.

Q. Well, tell me how it was.

A. She wasn't there like continuously, you know. She was there so that it would look basically normal. It wouldn't make sense for me to just be sitting in a hotel by myself. So, you know, she came and left, came and left.

She wasn't there continuously, straight, just living there. Like we were there on the pretense of having some, or whatever; because it wasn't like that.

Q. Whose idea was it that you have a female companion?

A. Mine.

Q. Your idea?

A. (Indicates yes.)

Q. Is that right?

A. Well, just about the whole way that I went about doing this, was my idea. They, you know, they said that they would let me do it however I figured I could get all the information and I asked them well, can I do it this way? Will you try to do it that way? Because I was the one risking my life, so I asked them to allow me to do it the way I wanted to do it. And they allowed me to do it like that.

Motions Transcript, April 28, 1986 at 44–45.

Finally, towards the end of his testimony, during cross-examination, the following took place:

[BY THE DEFENSE]:

Q. Well, is it fair to say that it must have been afterward, because you would not have discussed this with Mr. Skirtich about helping you get the sentence straightened out if you already had had the letter?

A. No, I was trying to help myself by contacting the parole commission to get my time straightened out.

The point that I feel like you are missing is like I done this because I wanted to do this, because I didn't like what they done to Toddy. That's why I done this. And that's it, point blank, what I done. That was the reason I done it.

Q. I know you are saying here—

A. So you can ask me a million times did they try to—if they wouldn't have done nothing for me, if I would have had to do the whole ten years, I would have done it. Because I feel like he would have done that for me.

Motions Transcript, April 28, 1986 at 57–58.

From the foregoing, it is readily apparent that the witness's consent had been freely obtained. Appellant's contrary allegations are belied by the record and even if true, in light of the witness's own testimony, we could not conclude that his consent was so tainted as to render his actions involuntary. *See United States v. Acavino*, 467 F.Supp. 284, 287 (E.D.Pa.1979); *United States v. Osser*, 483 F.2d 727, 730 (3d Cir.1973) (consent not rendered involuntary where cooperation obtained in return for lenient treatment, or because motivation altruistic or self-seeking). Accordingly, these claims are rejected.

Finally, appellant charges that the evidence was insufficient as a matter of law to sustain the verdict as to possession of heroin with intent to deliver. Appellant asserts that the Commonwealth failed to show that the heroin, alleged to have been delivered by appellant to Youngblood, did not come from either Youngblood's female friend or another individual who met with Youngblood at the hotel. Appellant further asserts the Commonwealth never established a chain of custody regarding the heroin, and lastly, that the powder analyzed by the Commonwealth's expert contained only 7/100 grams of heroin.

We begin our analysis of these claims by noting our standard of review in situations where the sufficiency of the evidence is challenged:

The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable

to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the [finder of fact] could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt.

*Commonwealth v. Aulisio,* 514 Pa. 84, 91, 522 A.2d 1075, 1079 (1987).

■ Applying this standard to the instant case, it is apparent that appellant's initial attack on the evidence is without merit. His assertion that the heroin could have come from a source other than his person is belied by the testimony of Coty Youngblood and the tape recorded conversation between himself and the witness. This evidence, we believe, is sufficient to prove that appellant was in possession of heroin. As the trial judge was free to believe this testimony, we reject appellant's claim of error.

■ Similarly without merit is appellant's assertion regarding the Commonwealth's alleged failure to establish a chain of custody regarding the heroin. As the Commonwealth aptly noted, there is no requirement that the prosecution produce every person who came into contact with the evidence, nor must every possibility of tampering be eliminated; it is sufficient that the evidence, direct or circumstantial, establishes a reasonable inference that the identity and condition of the exhibit remained unimpaired until delivery to the court. *Commonwealth v. Pedano,* 266 Pa.Super. 461, 405 A.2d 525 (1979). Here, the record indicates that after receipt of the heroin from appellant, Youngblood immediately gave it to Detective O'Leary who bagged, marked, and placed it in his locked desk drawer. The next morning, O'Leary took the heroin to the evidence room where it remained until examination by the crime lab. Under these circumstances, we find that the trial judge could have drawn a reasonable inference that the evidence had not been tampered with.

■ Lastly, we find no support in appellant's contention that the powder analyzed by the Commonwealth's expert amounted "only" to 70 milligrams of heroin. In as much as

the Controlled Substance, Drug, Device and Cosmetic Act does not designate the minimum amount of a controlled substance which must be delivered to constitute grounds for criminal liability, appellant's claim is irrelevant. *See* 35 P.S. § 780–101, *et seq.; Commonwealth v. Manley*, 252 Pa.Super. 77, 380 A.2d 1290, *vacated on other grounds*, 491 Pa. 461, 421 A.2d 636 (1977). This fact, coupled with the testimony of the Commonwealth's expert that the substance was indeed heroin, compels us to reject this claim as well.

Having found no basis upon which to grant the relief requested by appellant, we have no alternative but to uphold the judgment of sentence imposed by the trial court.

Judgment of sentence affirmed.

KELLY, J., concurs.

KELLY, Judge, concurring.

I join the majority opinion. I note that I find nothing in this opinion materially inconsistent with the views expressed by this author regarding the sole or dominant purpose test and the propriety of exclusion in *Commonwealth v. Melson*, 383 Pa.Super. 139, 163–75, 556 A.2d 836, 848–53 (1989) (Kelly, J., dissenting). To the extent subtle differences may be felt to exist, I remain of the views expressed in *Melson*.