682 A.2d 783

COMMONWEALTH of Pennsylvania, Appellee

v.

Rolf LARSEN, Appellant (Three Cases).

Superior Court of Pennsylvania.

Argued May 7, 1996.

Filed Aug. 5, 1996.

Reargument Denied Oct. 16, 1996.

510

512

Stanton D. Levenson, Pittsburgh, for appellant.

Robert A. Graci, Deputy Attorney General, Harrisburg, for the Commonwealth, appellee.

Before POPOVICH, SAYLOR and EAKIN, JJ.

514

POPOVICH, Judge:

We are asked to review the judgment of sentence (two years probation, costs of prosecution and removal from judicial office) by the defendant/appellant, Rolf Larsen, by the Court of Common Pleas of Allegheny County (per O'Brien, J.) for two counts of conspiracy to obtain possession of controlled substances. We affirm the convictions but remand for resentencing.

The facts, viewed in a light most favorable to the verdict-winner and drawing all reasonable inferences therefrom, reveal that in 1960 the defendant graduated from law school and practiced in Allegheny County for thirteen years before election to the Common Pleas Court. Four years later, the defendant won a seat on the Supreme Court of Pennsylvania and served seventeen years before a grand jury indicted him on two counts of criminal conspiracy regarding controlled substances and fourteen counts of possession of controlled substances.[1]

During a week-long jury trial, the evidence produced indicated that, beginning in the 1960s, the defendant was in therapy and receiving prescription medications. Once the defendant obtained judicial office, however, he became the subject of newspaper accounts in the Philadelphia Inquirer and the Pittsburgh Post–Gazette which triggered his desire to keep his mental illness a secret and avoid the societal stigma associated with this malady. Toward that end, the defendant was able to convince his attending physician (Dr. Earl Humphreys) to issue prescriptions in the names of his office employees (Barbara Roberts, Janice Uhler, Jamie Lenzi and Vera Freshwater) to treat his clinical depression and anxiety.

1. With the defendant's indictment, the Pennsylvania Supreme Court suspended him from office, the Court of Judicial Discipline suspended him without pay until the outcome of a Judicial Conduct Board and the Pennsylvania House of Representatives voted Articles of Impeachment to be tried on the Senate floor, the ultimate result of which was former Justice Larsen's impeachment and removal from office.

The sixteen-count indictment is the number remaining after a preliminary hearing before the District Justice resulted in a dismissal of numerous other charges. Following trial, the court stayed the sentence pending exhaustion of appellant's appeal rights.

This surreptitious activity continued for over twelve years before it was uncovered by the Attorney General's Office. During this time, prescriptions for Diazepam (a/k/a Valium) and Prozac would be retrieved at a pharmacy by the defendant's employees using their NPA[2] cards (issued to state judicial employees), which allowed for a discount in the payment of drugs and reimbursement by the defendant upon receipt of the medication.

The drugs would be issued on prescriptions written by Dr. Humphreys at the direction of the defendant utilizing a staff employee's name as the patient, for the purpose of maintaining the defendant's privacy concerning his diagnosed mental illness and treatment (weekly therapy and psychotropic drugs[3]) from the news media in particular and the public in general. To facilitate secrecy regarding the defendant's condition and treatment, Dr. Humphreys kept no written account of the type, quantity or the date drugs were prescribed for the defendant (via his employees) in his office medical records, all to insure the defendant's privacy, despite the violation of state and federal record-keeping laws in the dispensation of controlled substances.[4]

2. NPA is an acronym for National Prescription Administrators, which is a drug benefit program administered by the NPA on behalf of the state judiciary for its employees. Vol. I, 3/30–31/94; 4/4/94 at 391.

3. "Psychotropic" means that the drug has an effect on the central nervous system or the brain as it alters the mind and the mood of the patient. Vol. II, 4/5/94 at 567.

4. Dr. Humphreys did testify that, albeit the defendant was his friend of over twenty years, he felt "uneasy" prescribing medication in the names of other than the patient/defendant. However, he did so to protect his "friend" from negative publicity ("stigma") associated with mental illness. Vol. II, 4/5/94 at 488, 495, 514 & 518. Similarly, the defendant's staff was not all enamored with the idea of picking up drugs in their names for the benefit of the defendant, but did so to protect his privacy and because he was the "boss". Vol. I, 3/30–31/94; 4/5/94 at 220–21 (Barbara Roberts felt "uncomfortable" and "distressed", but she had no choice because the defendant was the "boss"), at 246 (Janice Uhler: Defendant was the "boss"); contrast at 287 (Jami Lenzi: "didn't feel that there was anything wrong"); Vol. II, 4/5/94 at 311 (Vera Freshwater did not fear loss of job. She did it to maintain defendant's privacy from the media).

The defense painted a picture of the defendant as one rising like Phoenix from the ashes of a dysfunctional home to the singularly prestigious position of Justice of the Pennsylvania Supreme Court. Also, the defense paraded a host of esteemed witnesses to give testament to Larsen's "excellent" reputation in the community for being law-abiding and truthful. Lastly, the defendant submitted a cascade of letters of commendation and awards extolling his altruism and integrity as beyond reproach.

Yet, despite the accolades bestowed upon the defendant by his character witnesses (friends and employees alike), his undoing was his rationale for anonymity from the press and public regarding his mental illness and treatment with a scheme (labelled by the defendant as a mere "arrangement") executed with the aid of his physician and employees to keep his use of Prozac and Diazepam private. This did not sway the jury, which returned a verdict of guilty on two of the sixteen counts of the indictment charging criminal conspiracy to possess Schedule IV substances in violation of The Controlled Substance, Drug, Device & Cosmetic Act (hereinafter the "Drug Act").[5] An oral motion for a judgment of acquittal or a new trial was denied, sentence was imposed and this appeal followed raising twenty-nine trial and sentencing issues, along with eighteen ineffectiveness of counsel claims.

█ The first issue we shall address challenges the sufficiency of the evidence in that the defendant's conduct "in obtaining his medically required and medically prescribed prescription medicines through the use of an agent does not constitute a crime[.]" We disagree and look, initially, to Subsections 12 and 14 of Section 780–113 of the Drug Act, which reads:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

\* \* \* \* \* \*

5. Act of April 14, 1972, P.L. 233, No. 64, § 1, 35 P.S. § 780–101 et seq.

(12) The acquisition or obtaining of possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge. . . .

\* \* \* \* \* \*

(14) The administration, dispensing, delivery, gift or prescription of any controlled substance by any practitioner or professional assistant under the practitioner's direction and supervision unless done (i) in good faith in the course of his professional practice; (ii) within the scope of the patient relationship; (iii) in accordance with treatment principles accepted by a responsible segment of the medical profession.

35 P.S. § 780–113(a)(12), (14). Additionally, the law requires written prescriptions for all controlled substances to assure that pharmacists keep accurate records of the drugs dispensed and to whom they were dispensed. *Id.* at §§ 780–111(b), 780–112.

There is no dispute that Dr. Humphreys, as a physician of thirty years, was aware of the law requiring records to be kept, and he considered that ministerial act an "important" part of the physician's practice. Nonetheless, he avoided maintaining any documentation of the appellant's mental illness or drug prescriptions because of his long-standing friendship with the appellant and the need for privacy regarding his mental condition, *a courtesy never extended to any other patient.*

With regard to Subsection 14, the prescribing of drugs by a practitioner must be performed in "good faith," within the scope of the "patient-physician" relationship, and be in compliance with accepted treatment principles endorsed by "a responsible segment of the medical community."

At bar, regarding treatment principles accepted by a responsible portion of the medical community, Drs. Fuller, McCormick and Wettstein were in agreement that record-keeping was "very important" in the long-term care of any patient, and to monitor the effects of prescription drugs a face-to-face meeting with the patient was necessary to gauge

the continuation or change of treatment, *none of which was adhered to by the appellant's physician.*[6] Further, the physicians were adamant in their refusal to prescribe medication for a patient in another's name. It was felt to be too dangerous, nonetheless Dr. Humphreys indulged the appellant's wishes and issued medication for him through his employees.

In light of such behavior by the patient and physician, viewed against the backdrop of accepted medical treatment at odds with the events which transpired here, we find sufficient evidence to establish a violation of Subsection 14 of Section 780–113. See *Commonwealth v. West,* 261 Pa.Super. 246, 396 A.2d 380, 382 (1978) ("The purpose of [the Drug Act] ... is to regulate the distribution of drugs, avoid abuse and insure proper medical use."). To hold otherwise would ignore the clear mandate of the Legislature in requiring record-keeping in controlled substance cases, with the obvious benefit of avoiding abuse, tracking sales and checking a patient's consumption. See generally *Commonwealth v. Bernabei,* 86 Pa.Super. 550, 555 (1926); *People v. Oviedo,* 106 Cal.App.2d 690, 235 P.2d 612, 613–14 (1951) (Use of false name to obtain prescription prohibited by Health and Safety Code, notwithstanding the defendant's ability to have received the narcotics if he had not committed acts forbidden by law).

Similarly, we find that the appellant's securement of Diazepam (Valium) was in direct contravention of Subsection 12 of Section 780–113. Once the appellant put in motion a scheme to deceive the pharmacists who dispensed drugs prescribed for his employees, but intended for his use, the subsequent possession of the drug was not lawful. Rather, it was a deception perpetrated upon a third party/pharmacist by the concerted acts of the appellant's unindicted co-conspirator/physician. For example, each pharmacist who testified

6. Dr. Humphreys did not physically examine the appellant before prescribing medication, and the type of drugs being taken was changed with a phone call from the appellant without visiting the doctor. This conduct was condemned by the Commonwealth's experts as inconsistent with accepted medical practice in the community. Vol. III, 4/6/94 at 542–43, 546, 573 (Dr. Fuller); at 599, 601 (Dr. McCormick); at 623, 643 (Dr. Wettstein).

was unanimous in his refusal to fill a prescription for other than the named patient. Each physician testifying for the prosecution echoed the same sentiments by refraining from issuing prescriptions for other than the patient.[7] Anything less would violate the medical professionals' Code of Ethics. See Vol. II, 4/5/94 at 587, 601–02.

The appellant states that Dr. Humphreys intended the prescribed medication to end up in his possession ultimately, and it merely took a circuitous route by way of his staff before reaching its destination. We find this "end justifies the means" argument rings hollow when viewed against the clear and unambiguous language of Subsections 12 and 14 of Section 780–113. See Statutory Construction Act, 1 Pa.C.S.A. § 1921(b) (The clear language of a statute is not to be ignored under the pretext to pursue its spirit).[8] Likewise, the appellant's argument that he did not "know that the innocent use of an agent to obtain the medicine he medically needed would be deemed to be criminal conduct" was an issue of credibility decided against his interest by the jury, which had the right to believe all, some or none of the evidence presented. See *Commonwealth v. Barnosky*, 264 Pa.Super. 443, 400 A.2d 168 (1979).

Further, we wish to respond to the appellant's analogy of his employees' conduct to an agent acting for an undisclosed principal in a real estate transaction as missing the mark. In the context of a real estate deal, the seller cares not to whom he sells the realty, whereas the pharmacists here testified that a sale would not have occurred had they known that the prescriptions were destined for one other than the named patient/employee.

By contriving to obtain a controlled substance (Diazepam) by the use of his employees, the appellant precluded each pharmacist from complying with housekeeping measures (matching records of dispensed controlled substances with a

7. Even the psychiatrist who has been treating the appellant since August of 1990 indicated his refusal to prescribe medicine to a patient in the name of someone else. Vol. III, 4/6/94 at 865–67.

8. Act of December 6, 1972, P.L. 1339, No. 290, § 3.

patient) mandated by 35 P.S. § 780–112(a) (for two years). No amount of importuning of efforts to keep the appellant's mental illness and treatment from the public can minimize the fact that deception was at the heart of the appellant's scheme to achieve anonymity. Such conduct cannot and will not be condoned, for to do so in the face of legislation to the contrary, would constitute selective application of the law. An argument for change or exceptions to prosecution is more appropriately directed to the Legislature and not this tribunal.[9]

9. We find equally unpersuasive the appellant's (Issue B) request that we label his behavior "de minimis" in nature and so trifling in magnitude and consequence (no victim to complain—"no harm no foul" logic) that his conviction should be dismissed.

We view the manipulation of a right (to prescription drugs) intended for individual use and obtained by subterfuge perpetrated with the aid of unwilling participants (physician stated he felt uncomfortable with the cover-up) over a number of years to be unprotected activity. In other words, the appellant's scheme was proscribed by law and not too trivial or unique in its cause to escape condemnation by the Legislature. See 18 Pa.C.S.A. § 312 (De minimis infractions and the allowance of dismissal).

Issue D fares no better in the appellant's effort to overturn his conviction for criminal conspiracy on grounds that his acquittal of all fourteen counts (numbered three to sixteen) of the underlying overt acts of the two conspiracy convictions warrants dismissal of his convictions. We think not.

In this jurisdiction, inconsistent verdicts are not a basis for reversal. *Commonwealth v. Carter*, 444 Pa. 405, 282 A.2d 375, 376–77 (1971). In fact, this Court has held that a conviction of conspiracy, even when coupled with an acquittal of the underlying overt act of conspiracy, will not be reversed provided the facts are sufficient to support sustaining the jury's verdict. See, e.g., *Commonwealth v. Cassidy*, 423 Pa.Super. 1, 620 A.2d 9, 12 (1993); *Commonwealth v. Jackson*, 385 Pa.Super. 401, 561 A.2d 335, 339–40 (1989); *Commonwealth v. Wanamaker*, 298 Pa.Super. 283, 444 A.2d 1176, 1178 (1982). We have examined the facts and hold them sufficient in quantity and quality to uphold the appellant's convictions. We see no reason to deviate from that finding now.

In Issue E, the appellant contends that prosecutorial misconduct and abuse of process was engaged in by the Attorney General's office in leaking information of grand jury activity relative to its report and presentment concerning his indictment. The appellant, in his brief to us, proceeds to list conduct attributable to the Attorney General which is reflective of alleged conduct occurring *after* the grand jury presentment had been prepared but before it was publicized.

Because the appellant's allegations fall short of producing evidence that the grand jury process was tainted by the Attorney General and/or personnel from his office entitles him to no relief. Specifically, the

■ Next, the appellant raises for our consideration the claim that prosecution of his "innocent and legitimate" actions impinged upon his federal and state constitutional right to privacy.

As observed in our discussion of the sufficiency claim, the appellant's conduct was proscribed by the Drug Act, and, as such, not innocuous activity entitling him to the mantle of protection afforded by the federal and state constitutions' privacy doctrine. To explicate, under the specific facts of this case, the appellant's mental condition and care were known to his staff, who fall outside any physician-patient confidentiality sphere and would undermine any "privacy" shield raised to

appellant's notation that the Attorney General "proceeded to 'selective-ly' present witnesses and dubious evidence to the grand jury to obtain th[e] preordained end [of prosecuting the appellant]" lacks substance, which cannot be buttressed by mere rhetoric of post-indictment activity. See Appellant's Brief at 80–91. Thus, absent evidence of at least a prima facie showing of impropriety by the appellant dispenses with the need to determine whether a dismissal of the indictment is warranted. *Commonwealth v. Williams,* 388 Pa.Super. 153, 565 A.2d 160, 163–64 (1989).

In Issue F, the appellant protests, in a dual attack on his sentence, that his conspiracy conviction should be graded a misdemeanor and that a layperson cannot conspire to violate 35 P.S. § 780–113(a)(14), as it applies to medical practitioners with regard to the grade of the offense for which he was convicted. 18 Pa.C.S.A. § 905 of the Crimes Code permits the crime of conspiracy to be graded equal to the most serious offense which is the object of the conspiracy.

The violations of the Drug Act constituted separate and discrete offenses of ungraded felonies. See 35 P.S. § 780–113(f)(3); Appellee's Brief at 69–71; Criminal Complaint, Counts 1 and 2. Consequently, the felony grading will stand. As to the "impossibility of conviction" under Subsection 14 of Section 780–113 because the appellant was not a "practitioner" as that term is defined under the Drug Act to encompass a person licensed to distribute drugs in the course of professional practice, albeit not preserved for appellate review we will address it in the interest of judicial economy and to avoid its resurfacing as an ineffectiveness of counsel argument.

Having so stated, we observe that the Commonwealth proceeded on a theory of accomplice liability. See Vol. IV, 4/7–9/94 at 1149. As such, we hold that the appellant was properly convicted of conspiring to violate Subsection 14 of Section 780–113. Further, the appellant's "selective prosecution" claim, raised for the first time on appeal, will be responded to (see supra—judicial economy and ineffectiveness of counsel avoidance), and in doing so, the unsubstantiated, self-serving claim is devoid of merit and allows for no relief.

protect disclosure of his diagnosed dysthymia (chronic low feeling) with concomitant anxiety. Cf. *Tracy v. Tracy*, 377 Pa. 420, 105 A.2d 122, 125 (1954) (Attorney-client privilege not applicable if it takes place in presence of third party).

■ More to the point, the United States Supreme Court has upheld legislation requiring physicians prescribing controlled drugs to report to the State identification information about the patient; to-wit:

> ... disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy.

*Whalen v. Roe*, 429 U.S. 589, 602, 97 S.Ct. 869, 878, 51 L.Ed.2d 64 (1977) (Footnote omitted); see also *In re Grand Jury Proceedings*, 801 F.2d 1164, 1169 (9th Cir.1986); *United States v. Greenberg*, 334 F.Supp. 364, 366–67 (W.D.Pa.1971). Therefore, with the Commonwealth's right to require records of dispensed controlled substances to avoid abuse or contraindication of different drugs to one patient at the same time, we find no merit to the appellant's right of privacy argument or his assailing the constitutionality of 35 P.S. § 780–113(a)(12), (14).

■ Also, the appellant proffers in Issue G of his brief that the trial court committed reversible error in requiring him to disclose the names of witnesses he proposed to call at trial.

At the outset of the jury selection process, the court requested a list of the appellant's prospective witnesses "to be able to read their names to the prospective jurors and ask them to indicate ... if they knew any of them * * * because if the jurors kn[e]w any of the witnesses, that could create a problem." The appellant provided five of his character witnesses before the court offered, as an alternative, to poll the jury each time a defense witness was called to the stand.

The appellant objected to the alternative method and supplied his witness list. He now states that he "suffered extreme prejudice" by this forced disclosure of a witness list because the Attorney General and the Pennsylvania Supreme Court allegedly contacted these witnesses "and induced some of them to refuse to testify...." These bald allegations of misconduct against the prosecution are substantiated by no more than the self-serving complaint of prejudice by the appellant. As unsupported allegations of ineffectiveness of counsel will be held meritless when raised in a vacuum and unsubstantiated in the record, see *Commonwealth v. Brown*, 342 Pa.Super. 249, 492 A.2d 745, 751 (1985), citing *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332, 1335 (1981), we conclude that the present claim of trial court error is similarly devoid of merit. *Id.*

With Issue H, the appellant continues his assault upon the trial court by averring that the admission of prescription charts was prejudicial.

■ The decision to admit charts is left to the sound discretion of the trial judge and will not be considered prejudicial where such evidence assists the jury in clarifying facts. *Commonwealth v. Hess*, 378 Pa.Super. 221, 548 A.2d 582, 590 (1988). The charts were used to aid the expert witnesses and jury in appreciating the drugs as to the type, quantity, date prescribed and to whom issued over a nine-year period. We conclude that the charts clarified facts establishing violations of Subsections 12 and 14 of Section 780–113. The trial court did not abuse its discretion in admitting the charts into evidence.

■ The appellant assigns the trial court with error in Issue I in permitting the Commonwealth to introduce evidence and testimony of all prescription medicines used by the appellant between 1984 to 1993.

The scheme between the appellant and Dr. Humphreys encompassed the years stated. The purpose for such confederation was carried out by means of by-passing treatment principles accepted by a responsible segment of the medical

profession without monitoring the patient with office visits and physical examinations as to the efficacy of the numerous drugs prescribed. As such, we find the introduction of the prescription evidence germane and not an abuse of discretion calling for a new trial.[10]

■ At Issue K, the appellant contends that the admission of the testimony of Barbara Roberts and Vera Freshwater was irrelevant (regarding picking-up prescription drugs in their names for the appellant in 1984–89 and 1992–93, respectively) in that neither was mentioned in the counts charging violations of Subsection 12 of Section 780–113. As remarked by the trial court on this matter:

The law is clear that no specific overt act need be alleged in a count charging conspiracy. *Commonwealth v. Hassine*, 340 Pa.Super. 318, 490 A.2d 438[, 460 n. 27] (1985). Nonetheless, the testimony of th[e]se two women was . . . relevant to establish the conspiracy counts. Since [the appellant] has not alleged surprise, his claim of prejudice must fail.

Trial Court Opinion, 1/19/95 at 14. We agree.

■ The appellant cites at Issue L that the trial court erred in permitting certain witnesses (Drs. Fuller, McCormick & Wettstein) to prove state and federal record-keeping violations, which were irrelevant, inflammatory and prejudicial. See discussion supra, wherein we recount in detail the relevance of the doctors' and pharmacists' account of the appellant's doctor's failure to follow accepted medical practices in the community as to evaluating, diagnosing and treating a patient with follow-up visits and written documentation of the course of procedure recommended in a patient's treatment, none of which was complied with by Dr. Humphreys when it came to documenting or even examining the appellant as to his

10. The appellant's Issue J, that the Commonwealth compounded the erroneous and prejudicial introduction of the charts with argument that he abused drugs, is not substantiated in the record. Moreover, the court instructed the jury that the appellant was not charged with abusing drugs, which we find eliminated any likelihood of prejudice. See *Commonwealth v. Bonace*, 391 Pa.Super. 602, 571 A.2d 1079, 1084 (1990).

care with prescription drugs. All of the preceding witnesses' testimony was relevant to establish a violation of Subsection 14 of Section 780–113 (not following accepted medical practices in the community) in the conspiratorial web of deceit engendered and prolonged by the appellant and his unindicted co-conspirator doctor. No error will be assigned for admitting such evidence at trial. See *West*, supra; *Oviedo*, supra.

Appellant's Issue M provides no ground for relief for we hold that no error was committed by the trial court in denying his Motion to Compel a Response to a Bill of Particulars.

■ The purpose of a bill of particulars is to give notice to the accused of the offenses charged in the indictment or information to allow him/her to prepare for trial and prevent surprise. *Commonwealth v. Dreibelbis*, 493 Pa. 466, 426 A.2d 1111, 1114 (1981).

■ Sub judice, the Commonwealth submitted an eleven-page reply to the appellant's request for information, the substance of which detailed the Commonwealth's theory of the case and responded to all relevant factual inquiries. See Exhibit "B" attached to Appellant's "Motion to Compel Response For Bill of Particulars".

The appellant's assertion that his ability to prepare for trial was prejudiced by the Commonwealth's failure to comply with Pa.R.Crim.P. 304 (Bill of Particulars) is undermined by our review of the Commonwealth's response to the appellant's demand for a more detailed Bill of Particulars without any evidence of prejudice manifested therein. There is no evidence that the Commonwealth withheld exculpatory evidence or evidence otherwise favorable to the defense. Nor were any exceptional circumstances alleged. In addition, no "surprises" were shown to have occurred at trial. In such a situation, we decline the appellant's invitation to find an abuse of discretion.[11] *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471,

---

11. In his bid for a new trial, the appellant raises ten issues regarding the court's charge to the jury. Examining the issues in reverse order of presentment, the appellant contends (Issue W) that reinstructing the jury, rather than merely answering "yes", to a question whether the

prosecution needed to prove "beyond a reasonable doubt a criminal intent and/or knowledge to find the Defendant guilty in regards to count 3 through 16?" was error. Because the appellant was found not guilty of counts three through sixteen, and no judgment was imposed, we need not address this issue. See *Commonwealth v. Smith*, 322 Pa.Super. 389, 469 A.2d 676, 679 (1983).

Next, the appellant points to the court informing the jury of the fact that this case did not involve drug abuse as highly prejudicial and justifying a new trial. Ironically, it was the appellant, in his Request for Jury Instructions at Nos. 7 & 8, who asked and received the trial court's imprimatur to advise on the subject he now complains should never have been broached. See Vol. IV, 4/7–9/94 at 1095–97. Despite this acquiescence by the appellant, we have examined the jury charge as a whole and hold that the disputed portion thereof (appellant "is not charged with abusing drugs, and the Commonwealth need not prove that [the appellant] did abuse drugs") guided the jury by narrowing its topic for deliberation. See *Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273, 1276 (1990).

Issue U charges that the trial court erred in failing to instruct the jury that "reckless or negligent conduct was not enough to convict." On this subject, the trial court informed the jury that the Commonwealth was required to prove beyond a reasonable doubt that the appellant knew he was receiving a controlled substance and was aware of the presence and nature of the substance. Vol. IV, 4/7–9/94 at 1148, 1180–81 & 1182 (appellant intended his acts and knew what he possessed constituted a controlled substance—Diazepam). Nothing from our review of the charge suggests that either reckless or negligent conduct was sufficient to convict. The law presumes that the jury will follow instructions. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873, 879 (1975). As such, we find no commission of error by the trial court.

At Issue T, the appellant argues that the trial court erred in not telling the jury that he was not charged with committing a crime involving NPA.

During the course of trial, the court gave a cautionary instruction, following a reading of the label on a vial that federal law prohibited transfer of drugs to anyone other than the patient, that no federal law had been violated nor had the appellant been charged with defrauding NPA. Vol. II, 4/5/94 at 329–30 & 333. As with the preceding issue, with the court's advising what the appellant was charged with by the prosecution at Vol. IV, 4/7–9/94 at 1147, we have no reason to believe that the jury did not comply with the instruction at the close of the case and direction during the course of trial regarding the purpose of the NPA testimony. *Stoltzfus*, supra.

In response to Issue S, we hold that the court properly instructed the jury that, "[a]lthough the [appellant] has not been charged with violating [35 P.S. §§ 780–111, 780–112—record to be kept by pharmacies], you may consider that these record-keeping requirements are, in fact, mandatory upon physicians and pharmacists when you decide this case." This instruction was needed to place in perspective testimony to establish the standard medical practice in the community (required to be contravened to establish a conspiracy to violate Subsection 14 of Section 780–113). Thus, the instruction was proper and not an abuse

of discretion. *Commonwealth v. Birdseye,* 432 Pa.Super. 167, 637 A.2d 1036, 1043 (1994).

Appellant's Issue R raises a claim similar to the preceding issue, the rationale for which is equally applicable here, allowing the court to state to the jury that the record-keeping requirements mandated for physicians and pharmacists could be considered by the fact-finder, even though the appellant was not charged with the same, in deciding the case. *Id.* This instruction explained the relevant precepts applicable to the case, and it was a proper subject of inquiry given the Subsection 14 charge. *Commonwealth v. West,* 261 Pa.Super. 246, 396 A.2d 380 (1978) does not preclude the introduction of such information to complete the picture of conspiratorial activity charging a violation of Subsection 14 (whether prescription drugs were in compliance with treatment principles accepted by a responsible segment of the medical profession, which is required to keep records under 35 P.S. § 780–112).

Issue Q attributes the trial court with error in failing to direct the jury that the appellant could be found guilty of Subsection 14 of Section 780–113 because it applies solely to a medical practitioner or professional assistant under his/her direction. With the Commonwealth proceeding on a theory of accomplice liability as to Subsection 14, there was no basis for the court to have given the instruction complained-of by the appellant. The issue affords the appellant no remedy.

At Issue O, the appellant assails the court's charge on conspiracy because the evidence allegedly was insufficient to instruct on such a crime. Our discussion supra, wherein we held that the evidence was sufficient beyond a reasonable doubt to uphold the appellant's conspiracy convictions, dispenses with the need to respond, in detail, here to an argument which has already been answered and held meritless in a different context, but yielding the same result that the appellant conspired to violate Subsections 12 and 14 of Section 780–113.

In responding to Issue P, wherein the appellant verbalizes that the court erred in advising the jury that a conviction on the conspiracy charges could be returned if it found that on "one of the twenty-eight occasions" the drugs were prescribed by Dr. Humphreys for the benefit of the appellant, we hold that a verdict of guilty could be returned. This is so even though one-half of the twenty-eight occasions mentioned to convict on conspiracy for prescribing drugs were dismissed at the preliminary hearing and the remaining fourteen substance offenses (at counts three through sixteen) resulted in acquittal does not affect the soundness of the two conspiracy verdicts at counts one and two of the indictment. As observed by the Commonwealth:

> ... nothing in the law requires that an overt act in pursuance of a conspiracy must also be charged as a substantive offense. ... [T]here is no requirement that the information even set out the avert acts. *Commonwealth v. Steele,* 408 Pa.Super. 128, 135, 596 A.2d 225, 229 (1991), *appeal denied,* 531 Pa. 653, 613 A.2d 559 (1992).

Larsen's acquittal of the fourteen substance offenses which were among the objects of the conspiracies charged does not effect the soundness of the verdicts of guilt on the conspiracy charges. It bears repeating that "the law has always considered criminal conspiracy and the completed substantive offense to be separate crimes." *Commonwealth v. Miller,* 469 Pa. 24, 364 A.2d 886, 887 (1984). The rationale for this distinction was summarized by the United States

Supreme Court in *Iannelli v. United States*, 420 U.S. 770, 778, 95 S.Ct. 1284, 1290, 43 L.Ed.2d 616, 623 (1975): "In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise."

Appellee's Brief at 98–99. We agree and find meritless the assertion of trial court error presented here.

In the last of the appellant's attacks on the charge to the jury (Issue N), he postulates that the failure of the court to instruct the jury that to convict him "criminal intent" had to be established, and his conviction could not stand in its absence. Specifically, the appellant asserts that the court failed to instruct the jury that "criminal intent (guilty knowl-·edge, conscious wrongdoing) is an essential element of the offense[s]" presented, which encompass counts one to sixteen. Since "not guilty" verdicts were returned as to counts three to sixteen, any assignment of error as to these counts is moot. See *Smith*, supra.

As for counts one and two, our review of the entire charge, which includes two questions by the jury as to the "criminal intent" element, satisfies us that the veniremen were placed on notice that proof of "guilty knowledge" was needed to return a verdict of guilty. On this point, the trial court told the jury that to find the defendant guilty the Commonwealth needed to prove beyond a reasonable doubt that the defendant "knew" he was obtaining Diazepam. Vol. IV, 4/7–9/94 at 1181. This comports with the spirit of and language in *Commonwealth v. Lurie*, 524 Pa. 56, 569 A.2d 329, 333 (1990), which provides that:

Fraud involves deliberate and intentional conduct calculated to deceive. Reckless conduct or negligence is not conduct deliberately calculated to deceive

. . . .

Generally, when the proscribed conduct necessarily involves deceitful acts and acts of fraud, criminal intent or guilty knowledge is an essential element of the offense. [Citation omitted]

Subsection 12 of Section 780-113 prohibits the acquisition of controlled · substances by "misrepresentation, fraud, forgery, deception or subterfuge," which conduct is deliberate behavior calculated to deceive. *Id.* Informing the jury that the Commonwealth must prove that the appellant "knew" he acquired or obtained a controlled substance is interpreted by this Court (along with the reasonable inferences to be drawn therefrom) to advise the jury that "guilty knowledge is an essential element of the offense." See Vol. IV, 4/7–9/94 at 1151 (Defendant agreed with another that either would engage in conduct constituting a crime or an attempt or solicitation to commit those crimes, and defendant did so with the intent of promoting or facilitating the commission of those crimes); at 1182 (In response to a second question, the jury was informed: "the Commonwealth must prove beyond a reasonable doubt that the Defendant knew he was receiving a controlled substance."). To read the preceding instructions as not informing the jury that "knowledge" was an element of the offenses would do violence to the tenet that jury charges are to be read as a whole to determine if they instruct the jury on the law, and the court may use its own language provided it adequately, accurately and clearly expresses the precepts of law. *Commonwealth v. Jones*, 449 Pa.Super. 58, 672 A.2d 1353, 1358 (1996); *Commonwealth v. Balog*, 448 Pa.Super. 480, 672 A.2d 319, 323 (1996); *Commonwealth v. Whitner*, 278 Pa.Super.

478 (1972); *Commonwealth v. Hassine,* 340 Pa.Super. 318, 490 A.2d 438, 461 (1985).

■ We now turn to the second phase of the case concerning a host of challenges relating to sentencing, the first of which questions the appellant's removal from office as a Justice of the Pennsylvania Supreme Court. This issue has been rendered moot by the appellant's impeachment (and removal from office) by the Senate of Pennsylvania on October 4, 1994, following his trial before the General Assembly. Cf. *Com. of Pa., Dept. of Trans. v. Hettich,* 542 Pa. 583, 669 A.2d 323 (1995) (Appellee's claim that his substantive due process rights were violated by categorizing him under an habitual offender statute was rendered moot with the subsequent amendment of the statute placing him outside the statute's reach); Pa.R.App.P. 1972 (Any party may move to dismiss for mootness). Accordingly, with the Legislature's impeachment of the appellant, to respond to the "removal" claim at this stage would be merely advisory since the relief sought ("reinstatement") is beyond the authority of this Court to grant. In the same vein, no mention is made of the need for a ruling on the "removal" issue to settle any "pension" rights which may be affected by the appellant's conviction. See Appellant's Supplemental Brief at 49–50 (Issue XVIII). Therefore, in keeping with this Court's reluctance to issue advisory opinions, we will refrain from addressing the "removal-from-office" issue.[12] See note 1, supra.

175, 420 A.2d 486, 490 (1980). Consistent with such remarks, we find the commission of no error by the trial court in failing to quote *Lurie* verbatim.

Interestingly, the appellant denied having any knowledge that his actions were prohibited (see Vol. III, 4/6/94 at 1062), a matter which the credibility-assessor-jury disbelieved despite the "good character" testimony for truthfulness proffered by the appellant. We will not invade the bailiwick of the jury on a credibility issue, an area foreclosed to us on appeal.

12. Even if, arguendo, we could address the merits of the "removal-from-office" claim, we would not be able to grant the appellant any relief in the absence of authority ("subject matter jurisdiction") to entertain this claim since "the Supreme Court [has] exclusive jurisdiction over all appeal from the final orders of the courts of common pleas in all cases involving the right to public office. 42 Pa.C.S.A. § 722(2)."

 The next sentencing question relates to the court's alleged lack of jurisdiction to order the appellant to pay a portion (ten percent) of the grand jury and prosecution costs with the perfection of an appeal prior to their issuance.

On June 13, 1994, the appellant was sentenced to two years probation, two-hundred-forty hours of community service and removal from office. Four days later, the removal-from-office order was appealed, but a hearing to assess costs on July 5, 1994 (without any resultant entry of a dollar figure) was delayed until July 7, 1994. It was not until July 13, 1994, that the court imposed costs totalling $38,875.16, following which another appeal was perfected charging that the July 13th order was "a legal nullity" with the appellant's July 7th appeal divesting the court of jurisdiction to issue the July 13th order.

Whether the "cost of prosecution" is part and parcel of the sentence or is a distinct entity that may be appealed at a different/later date necessitates that we examine first 42 Pa. C.S.A. § 9728(a), which reads:

All restitution, reparation, fees, costs, fines and penalties shall be collectible in any manner provided by law. However, such restitution, reparation, fees, *costs,* fines and penalties *are part of a criminal action or proceeding and shall not be deemed debts. A sentence,* pretrial disposition *order . . . for* restitution, reparation, fees, *costs,* fines or penalties *shall,* together with interest and any additional costs that my accrue, *be a judgment* in favor of the probation department *upon the person* or the property of the person *sentenced* or subject to the order. [Emphasis added]

Act of December 17, 1990, P.L. 726, No. 181, § 1, as amended, 42 Pa.C.S.A. § 9728(a) (Supp.1996). In *Commonwealth v.*

*Commonwealth v. Spano,* 451 Pa.Super. 226, 679 A.2d 240, 245 (1996). The appellant, being chosen by the electorate for a certain tenure and paid out of the public treasury, was a "public officer" as an elected Justice to the Pennsylvania Supreme Court. The appellant's removal from office, be it not for his impeachment by the Legislature, would be reviewable by the Pennsylvania Supreme Court. We see no need to transfer this matter to the high Court, however, in the face of "impeachment" that precludes the remedial relief ("reinstatement") sought by the appellant and exceeds the bounds of even the Supreme Court to grant.

*Gaddis,* 432 Pa.Super. 523, 639 A.2d 462, 472 (1994), we made it clear that fines and costs are "penal sanctions" arising from a criminal conviction. As a form of "punishment," the imposition of costs amounts to a part of the judgment of sentence. See, e.g., *Commonwealth v. Gill,* 288 Pa.Super. 538, 432 A.2d 1001, 1004 (1981) ("The Court ... ordered ... defendant's sentence suspended upon payment of a fine and costs of prosecution."); see also *Commonwealth v. Coder,* 490 Pa. 194, 415 A.2d 406 (1980); *Commonwealth v. Davy,* 456 Pa. 88, 317 A.2d 48 (1974).

Albeit an appeal of the judgment of sentence divests a lower court of jurisdiction to proceed further in the matter, Pa. R.App.P. 1701(b)(1) creates a caveat allowing the "trial court ... [to t]ake such action * * * permitted or required by these rules or *otherwise ancillary to the appeal ... proceeding."* (Emphasis added) Further, with the imposition of sentence (costs) on June 13, 1994, the court had thirty days therefrom to formalize the dollar amount making-up such costs (42 Pa.C.S.A. § 5505), which time-table was satisfied with the July 13th order setting costs at $38,875.16. *Id.* The court, having already indicated that the cost of prosecution would be part of the appellant's sentence, set forth the dollar amount to give the sentencing cost substance and enforcement perimeters to allow the collection agent for the court to act timely. Cf. *Commonwealth v. Denson,* 157 Pa.Super. 257, 40 A.2d 895, 896 (1945) ("The direction to pay the costs contained in the order of October 6, 1944, was not a sentence to pay something additional to the penalty imposed by law. It was rather an incident of the judgment entered on September 26, 1944, not expressed but implied, for the law imposes the payment of the costs on every defendant who pleads guilty to or is found guilty of a criminal charge.").

Issue Z charges that the assessment of costs and expenses was illegal and an abuse of discretion because no authority (statutory or otherwise) exists to impose costs associated with convening a multi-county grand jury, witness fees, clerk of court costs and attorney's fees upon the appellant.

We start our reply with the observation that the statute which made all persons convicted of a crime liable for the costs of their prosecution was 19 P.S. § 1223. This section has been repealed and replaced by the Act of July 9, 1976, P.L. 586, No. 142, § 2, eff. June 27, 1978, 42 Pa.C.S.A. § 1726, which provides that the Pennsylvania Supreme Court "shall prescribe by general rule the standards governing the imposition and taxation of costs, including the items which constitute taxable costs [and] the litigants who shall bear such costs. . . ." Our high Court has yet to promulgate such standards, which activates the Judicial Code (42 Pa.C.S.A. § 20003(b)) to preserve 19 P.S. § 1223 as part of our common law. See *Turner v. May Corp.*, 285 Pa.Super. 241, 427 A.2d 203, 206 n. 4 (1981); see also *Gill*, supra, 288 Pa.Super. at 552–53, 432 A.2d at 1009.

Next, under 16 P.S. § 1403 a defendant is obligated for the costs of prosecution and trial by the district attorney, with the amount to be paid initially by the county subject to reimbursement by the defendant. A panel of this Court most recently had the occasion to interpret Section 1403 to preclude the imposition of costs upon a defendant for an offense for which he was found not guilty. In the course of vacating the judgment of sentence imposing the illegal expenses, we wrote, as herein relevant, that:

> . . . the statute [16 P.S. § 1403] explicitly permits a District Attorney to be reimbursed for expenses incurred in prosecuting cases, with the proviso that the defendant be "convicted" *and* the expenses have arisen "in connection with such prosecution."

> \* \* \* \* \* \*

> . . . 16 P.S. § 1403['s] . . . very verbiage provides for the District Attorney's expenses incurred in the investigation, apprehension and prosecution of a defendant *to be paid by a defendant provided he/she "is convicted and sentenced . . . in connection with such prosecution."*

*Commonwealth v. Moran*, 450 Pa.Super. 283, 289–91, 675 A.2d 1269, 1272–73 (1996) (Emphasis in original). Accord *Coder*,

*supra* (Extradition costs part of the expenses to prosecute and payable by the defendant).

It is the appellant's position that, unlike 16 P.S. § 1403, the Investigating Grand Jury Act[13] (IGJA) provides that the expenses of any multi-county investigating grand jury, and the costs and expenses resulting from any trial of a person against whom a presentment has been issued by said jury, "shall be borne by the Commonwealth" and should exclude a defendant from any obligation for costs and expenses resulting from his trial.

We agree with the appellant that IGJA provides in clear and unambiguous language that where a trial results out of a

13. 42 Pa.C.S.A. § 4553(b) provides: "The expenses of any multi-county investigating grand jury shall be borne by the Commonwealth. In addition, the costs and expenses resulting from any trial of a person against whom a presentment has been issued by a multi-county investigating grand jury shall be borne by the Commonwealth. Costs and expenses under this subsection include, but are not limited to, all reasonable costs incurred by the county for the services of the courts, the county prison, the district attorney and any public defender appointed by the court and related costs and expenses incurred by the county in the course of the trial. Counties shall be reimbursed from the General Fund of the Commonwealth upon application to the State Treasurer through the Office of Attorney General pursuant to procedures prescribed by that office". As amended Dec. 19, 1984, P.L. 1089, No. 218, § 3, imd. effective; Dec. 19, 1984, P.L. 1189, No. 225, § 1 imd. effective, 42 Pa.C.S.A. § 4553(b) (Supp.1996).

In contrast, Section 1403 reads: "All necessary expenses incurred by the district attorney or his assistants or any officer directed by him in the investigation of crime and the apprehension and prosecution of persons charged with or suspected of the commission of crime, be paid by the county from the general funds of the county. In any case where a defendant is convicted and sentenced to pay the costs of prosecution and trial, the expenses of the district attorney in connection with such prosecution shall be considered a part of the costs of the case and be paid by the defendant." Act of Aug. 9, 1955, P.L. 323, § 1403, 16 P.S. § 1403.

In each statute, the initial costs associated with the investigatory and prosecutorial courses pursued by the government are to be paid by the county. Ultimate reimbursement occurs to said entity, as we interpret the statutory and common law framework existing in this Commonwealth, when and if the defendant is convicted and not before. See, e.g., *Commonwealth v. Moran,* 450 Pa.Super. 283, 675 A.2d 1269 (1996). Once this triggering mechanism of the guilt-determining-process has taken place, the imposition of costs as an incident of sentence comes into play.

grand jury investigation, the costs are to be satisfied by the Commonwealth. However, IGJA must be viewed as to what it does not provide as well, meaning there is no discussion or provision as to what transpires when the investigation initiated under IGJA culminates in a trial *and conviction* of the object of the inquiry.

We know that under the predecessor statute (19 P.S. § 1223), a defendant could not be held liable for expenses associated with a crime for which he was found not guilty. See *Commonwealth v. Cutillo*, 294 Pa.Super. 560, 440 A.2d 607 (1982); *Commonwealth v. Smith*, 239 Pa.Super. 440, 361 A.2d 881 (1976). It was only in those instances where the defendant was adjudged guilty that the recoupment statute was activated. *Id.* This same precept of requiring a convicted individual to shoulder the costs in bringing him/her to trial has been articulated in 16 P.S. § 1403. With the statutes and the case law interpreting each as a backdrop, we conclude that the rationale for issuing costs against a defendant is to shift the monetary drain of investigating and prosecuting crime upon the person who prompted the expenditure of time and money to bring the accused to justice, while not depleting the revenues of the public in doing so. It would add insult to injury to cause the citizenry who were wronged to absorb the cost of bringing the accused to justice. Cf. *Commonwealth v. Hower*, 267 Pa.Super. 182, 406 A.2d 754, 756 (1979) ("... neither the United States Constitution nor the Pennsylvania Constitution was violated by the requirement that 'a person who commits a crime thereby triggering the prosecutorial machinery of the Commonwealth, should repay the Commonwealth the necessary costs and expenses of prosecution, if he is found guilty beyond a reasonable doubt, and is financially able to do so.'" (Citation omitted)).

With the "accountability" goal of *Hower* in mind, we do not read IGJA to immunize those tried and convicted from the obligation of paying the government's costs to accomplish such a result. 19 P.S. § 1223 (repealed but a part of our common law via the Judiciary Act Repealer Act, 42 Pa.C.S.A. § 20003(b)) and 16 P.S. § 1403 provide the nucleus to hold a

convict responsible for the expenditure of the public's revenue to effectuate justice. Stated otherwise, we hold that where IGJA leaves off (by making no mention of the consequences flowing from a grand jury presentment—conviction), the common law takes over and obligates a defendant to answer for the costs of prosecution with conviction.[14] The priority of payment requires a governmental entity (county or Commonwealth) to satisfy the expense and seek reimbursement from the defendant. See *Moran*, supra; *Cutillo*, supra; *Smith*, supra. We will not realign this obligation to pay, where conviction occurs, from a defendant to the citizenry of this Commonwealth. Cf. 42 Pa.C.S.A. § 4553 (Supp.1996) (Expenses of any multi-county investigating grand jury shall be borne by the entity which initially expends revenue, with reimbursement from the Commonwealth if the county outlays revenue in the first instance).

In a related argument, the appellant asserts the spectra that the costs associated with his prosecution were excessive with his exoneration of fourteen of the sixteen counts charged by the jury, not to mention the twelve dismissed at the District Justice level, and should necessitate a pro rata reduction. From our review of the trial transcripts, and the accompanying criminal indictments, we discern that "all evidence relevant to the substantive charges was also relevant to the conspiracy counts. Therefore, the investigative and trial costs cannot be apportioned between those two sets of charges." Trial Court Opinion, 1/19/95 at 21; see also *Coder*, supra; *Commonwealth v. Soudani*, 193 Pa.Super. 353, 165 A.2d 709 (1960) (A defendant convicted of two charges may still be liable for the entire costs of prosecution even though one of the two charges is vacated).[15]

**14.** Even the Sentencing Code provides: "Any ... *costs* of ... appropriate governmental agency *shall be borne by the defendant....*" 42 Pa.C.S.A. § 9728(g) (Supp.1996) (Emphasis added).

**15.** In Issues AA and CC, the appellant asserts that the failure of the Commonwealth to give him "notice" in advance of seeking to remove him from office and impose costs, along with the impropriety assigned to the Pennsylvania Supreme Court as to the manner and method it sought to regulate the appellant's retrieval of his office belongings,

In the final sentencing claim, the appellant avers that the imposition of two years probation (one year for each of his conspiracy convictions) was illegal. Because the illegality of sentence is non-waivable, we find the Commonwealth's contention that this issue is waived for the appellant's "failure to properly brief this argument" to be specious. *Commonwealth v. Ford*, 315 Pa.Super. 281, 461 A.2d 1281 (1983).

Under 18 Pa.C.S.A. § 906 (Supp.1996):

A person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation or criminal conspiracy for conduct designed to commit or to culminate in the commission of the same crime.

Act of December 11, 1986, P.L. 1517, No. 164, § 1, as amended. Additionally, 18 Pa.C.S.A. § 903(c) reads:

Conspiracy with multiple criminal objectives.—If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship.

Act of April 28, 1978, P.L. 202, No. 53, § 7(2), as amended. The preceding statutes are to be read to prohibit, following conviction of multiple conspiracies, sentencing for each count charged where the "object" of the conspiracies was the same. *Commonwealth v. Perez*, 381 Pa.Super. 149, 553 A.2d 79 (1988); *Commonwealth v. Riquelmy*, 303 Pa.Super. 403, 449 A.2d 750 (1982).

At trial, the prosecution portrayed the appellant and Dr. Humphreys as "friends" for over twenty years who, beginning in 1981, conspired to funnel Diazepam (as well as other

violated his due process rights. Each claim has been reviewed and found to be meritless.

Further, as to the appellant's assault upon the "reasonableness" of apportioning ten percent of the cost of convening the Ninth Statewide Grand Jury to him (i.e., $38,857.16), the record (Transcript of June 13, 1994) and law are supportive of the propriety of the amount to be paid by the appellant. *Commonwealth v. Coder*, 490 Pa. 194, 415 A.2d 406 (1980).

controlled and non-controlled substances [16]) to Larsen via his staff to protect his privacy. *This was the singularity of purpose for which the duo embarked on a course of deception,* and each prescription issued in the appellant's employees' names (for ultimate retrieval by their "boss") was but an incident along a continuum of criminal behavior. The heart of the conspiracy being to secure drugs in violation of Subsections 12 and 14 of Section 780–113, each discrete purchase by the appellant's employees (with the use of Dr. Humphreys' prescription input) sought to achieve the common, single comprehensive goal of drugs without publicity. For such conduct, only the one penalty prescribed by the Crimes Code under 18 Pa.C.S.A. § 906 can be entered. See *Commonwealth v. Von Aczel,* 295 Pa.Super. 242, 441 A.2d 750 (1981); see also *Braverman v. United States,* 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942); *Commonwealth v. Lore,* 338 Pa.Super. 42, 487 A.2d 841, 855 (1984). Thus, the appellant should have been sentenced on only a single charge of criminal conspiracy. *Commonwealth v. Black,* 267 Pa.Super. 598, 407 A.2d 403 (1979).

Even the Commonwealth, in its brief at 133, makes reference to the consequences flowing from the illegality of the sentences. This Court may, in its discretion, either modify the sentence imposed or remand for modification. *Lore,* supra. We choose to remand to rectify the matter with our inability to determine whether the sentencing scheme of the court would be compromised were we to vacate the sentence of probation for either Subsection 12 or Subsection 14 conviction. Prudence and better practice dictate that we allow the court below to impose a sentence consistent with the facts and the law to penalize the appellant. *Ford,* supra. A remand will be ordered to achieve that end.

 In the third phase of the appellant's appeal, trial counsel's ineffectiveness is being argued by new appellate

---

**16.** Other Schedule IV drugs listed but not charged were: Serax, xanax, ativan, percocan, percocet, vicodin and propacet. Non-controlled drugs were: Buspar, robaxisol, flexeril, desyrel, trivil, proxac, elavil, norpramin and tylenol with codeine to name a few.

counsel unassociated with prior counsel in a brief which measures fifty-one pages in length and contains eighteen issues (covering two pages), all of which is in direction violation of Pa.R.App.P. 2116(a) & 2135(1).[17] Nonetheless, as we did with trial counsel's appellate brief raising trial and sentencing issues covering one hundred sixty-five pages, we will examine the claims in the interest of justice. Prior to doing so, we outline the standard which has been oft-stated to assess counsel's stewardship: 1) whether the issue/argument/tactic which counsel has foregone and which forms the basis of the assertion of ineffectiveness is of arguable merit; 2) whether the course chosen by counsel had some reasonable basis to benefit his client; and 3) whether counsel's (in)action worked to his client's prejudice. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987).

The first three issues center around the allegedly erroneous instruction to the jury to convict under Subsection 14 of Section 780–113 being at odds with *Commonwealth v. Salameh*, 421 Pa.Super. 320, 617 A.2d 1314 (1992), trial counsel's failure to object as proof of ineffectiveness and the prosecution's engagement in misconduct in failing to bring this decision to the trial court's attention.

In *Salameh*, this Court held that the jury was instructed accurately with regard to the elements of proof necessary to convict under Subsection 14; namely:

The trial court ... instructed the jury on this issue as follows:

Then you must find one of the following three: That the dispensing, delivery, or prescribing of the medication for [sic] the controlled substance was not done in accord with

---

**17.** The sheer number of ineffectiveness claims raises a question in this Court's mind as to the merit of any of them. Review the claims we must, but we have in our experience found that a profusion of issues masks a weak case for reversal. The better approach would be to select such issues exhibiting a reasonable likelihood of success, this way the resources of the court are not squandered on frivolous claims. See *Commonwealth v. Sirbaugh*, 347 Pa.Super. 154, 500 A.2d 453, 456 (1985).

the treatment principles accepted by a responsible seg-
ment of the medical profession, or, . . .

. . . this part of the instruction . . . is an accurate statement
of the law. Next, the trial court instructed:

Or, the Commonwealth must prove, beyond a reasonable
doubt, that the defendant in prescribing or dispensing the
controlled substance did not do so in accordance with
treatment principles accepted by a responsible segment of
the medical profession.

. . . This statement is also accurate.

*Id.* at 324, 617 A.2d at 1316. It was only when the trial court
attempted to explain *how* the jurors could determine whether
the Commonwealth had established what it was required to
prove that it erred; to-wit:

In order for you to find that the government has successful-
ly met its burden, you must find that the evidence which is
presented demonstrates beyond a reasonable doubt that *a
responsible segment* of the medical profession *would find*
that the defendant's prescribing of controlled substances to
the patients involved in this case medically *unacceptable.*

. . . This is an inaccurate statement of the law and instructs
the jury to convict under the wrong circumstances.

 \* \* \* \* \* \*

The trial court continued with the following instruction
which was likewise an inaccurate statement of the law:

If the evidence in the case leaves you with a reasonable
*doubt as to whether a responsible segment* of the medical
profession *would accept* as reasonable the treatment giv-
en by the defendant to the patients involved, then you
must find that the government has failed to establish this
element of the case. . . .

. . . the doubt of the jurors which would prevent conviction
under this statute is a doubt that no responsible segment of
the profession would accept the treatment methods, or that
all responsible segments of the profession reject those
methods. The trial court erred by requiring a finding that
the Commonwealth had failed to establish an element *if* the

jury doubted the proof of something which would have *relieved* appellant of guilt, i.e., whether a segment of the profession would *accept* appellant's practices.

*Id.* at 324–25, 617 A.2d at 1316–17 (Emphasis in original). Here, unlike in *Salameh*, the trial court did not attempt to elaborate on the burden of proof as it applied specifically to the elements to return a conviction under Subsection 14; to-wit:

The elements of the offense of A–14 are, first, the prescription of a controlled substance by a medical doctor; second, that the prescribing of the controlled substance was not done in accord with treatment principles accepted by a responsible segment of the medical profession and/or that the prescribing of the controlled substance was not done in good faith by a medical doctor and/or that the prescribing of the controlled substance was not done within the scope of the doctor/patient relationship.

\* \* \* \* \* \*

... the Defendant is presumed innocent throughout the trial unless and until you conclude based on careful and impartial consideration of the evidence that the Commonwealth has proven him guilty beyond a reasonable doubt.

It is not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crime charged, and that the Defendant is guilty of that crime beyond a reasonable doubt.

The person accused of a crime is not required to present evidence or prove anything in his own defense. If the Commonwealth's evidence fails to meet its burden, then your verdict must be not guilty.

On the other hand, if the Commonwealth's evidence does prove beyond a reasonable doubt that the Defendant is guilty, then your verdict should be guilty.

Although the Commonwealth has the burden of proving that the Defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt or to a

mathematical certainty nor must it demonstrate the complete impossibility of innocence.

A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs.

A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of crime.

A reasonable doubt must be a real doubt. It may not be an imagined one nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

Vol. IV, 4/7/94 at 1149–50, 1155–56. In light of the preceding, we see no contravention of the holding in *Salameh* at bar. With no error attributable to the trial court's charge, the allegations of ineffectiveness of counsel and prosecutorial misconduct fall as well.[18] *Pierce,* supra.

18. In a related argument (Issue IX), the appellant believes that counsel was ineffective when he neglected to object to the court's charge on Subsection 14, i.e., to the "good faith" issuance of prescriptions in a "doctor-patient" relationship. It is his contention that the Commonwealth's case did not consist of such elemental aspects, and, therefore, should not have been read to the jury. This is refuted by the evidence, which indicates that Dr. Humphreys was aware (when first approached by the appellant in 1981) that to issue prescription drugs in the name of someone other than the patient to circumvent record-keeping requirements was wrong, but it continued because of the doctor's friendship with the appellant and to protect his privacy.

Maintenance of records on a patient was considered "important" by Dr. Humphreys. Even so, he dispensed with this procedure in the appellant's case and provided this secrecy for no other patient. Vol. II, 4/5/94 at 471 & 483. Although the doctor felt "uneasy" in acceding to the appellant's request for anonymity, the practice continued for years before it was uncovered by the authorities. In this light, to allow the jury to consider the "good faith" and "doctor-patient" elements of Subsection 14 was proper and not reflective of inept trial counsel.

As to Issue X, wherein the "right to privacy" remarks of the court to the jury (as not being a defense) were permitted for jury consideration without counsel's objection, our discussion supra as to the inapplicability of such a defense (see *Whalen v. Roe,* 429 U.S. 589, 602, 97 S.Ct. 869, 877–78, 51 L.Ed.2d 64 (1977)) dispenses with the need to address it here under the cloak of an ineffectiveness of counsel claim.

Issue XI, claiming the failure of counsel to cite *Commonwealth v. West,* 270 Pa.Super. 301, 411 A.2d 537 (1979), in connection with Issue G (error to order disclosure of witness list) is specious and does not warrant extended discussion except to observe that the trial court was

Issues IV and V deal with "good character" and "record-keeping" instructions, the former of which consisted of the following relevant excerpts:

> The law recognizes that a person of good character is not likely to commit a crime which is contrary to his nature. Evidence of good character may by itself raise a reasonable doubt of guilt and require a verdict of not guilty.
>
> You must weigh and consider the evidence of good character along with other evidence in the case.
>
> If on all the evidence you have a reasonable doubt of the Defendant's guilt, you must find him not guilty.

Vol. IV, 4/7–8/94 at 1154. The appellant has no problem with the accuracy of the first paragraph. The second paragraph is taken from *Commonwealth v. Neely,* 522 Pa. 236, 561 A.2d 1, 3 (1989), which requires that character evidence is not to be viewed in isolation but "weighed against any present allegation to the contrary." This is what the trial court informed the jury to do, and, given the verdict, the proponents of the appellant's good character were not believed.

within its authority in seeking a witness list to inquire of the jury if anyone knew of the proposed witness(es) to avoid any chance of a mistrial in the absence of such a precaution. Similarly, counsel was not ineffective for failing to cite the definition of "infamous crime" from *In re Braig,* 527 Pa. 248, 590 A.2d 284 (1991) in his brief (Issue XII) since this related to the appellant's removal from office following his conviction by the trial court, an issue which we have held to be moot with the appellant's impeachment and removal from office by the Legislature. This renders any discussion on the issue superfluous.

Under the umbrella of Issue XIII, appellate counsel raises eight sub-issues attributing their waiver to prior counsel's incompetence. Because each sub-issue has either been held to be meritless in another portion of this opinion or meritorious (conspiracy convictions) and acted upon, we will not consume further time in replicating that which has already been stated labelling prior counsel effective.

Issue XIV assigns trial counsel with ineffectiveness for failing to object to the court's instruction of the term "prescription" or the Commonwealth's closing argument referencing the term's inapplicability to a hospital setting.

At trial, the defense elicited evidence that prescription drugs were issued at Allegheny General Hospital under a fictitious name to protect a patient's identity, but once released all prescription drugs were issued in the discharged patient's real name. Thus, since the defense placed the dispensing of drugs in a hospital at issue, the topic was a proper subject of the court's instruction and closing argument.

As for the instruction on record-keeping, it pertained to the statutory requirements that necessitate recordation when controlled substances are prescribed by a physician or dispensed by a pharmacist. See 35 P.S. § 780–112; *West,* supra; *Bernabei,* supra. This is what occurred here, and the prosecutor committed no impropriety in mentioning the subject in his closing. *Commonwealth v. Turner,* 390 Pa.Super. 216, 568 A.2d 622 (1989). Viewing the court's charge as a whole, we find the commission of no error as argued by the appellant in regard thereto.

Issues VI, VII and VIII each consider acts of omission by trial counsel as tantamount to ineffectiveness for failing to move for dismissal of Count I (Subsection 12 violation being a felony) when the Pharmacy Act (63 P.S. § 390–8) punishable as a misdemeanor applied, not objecting to the court's charge that the appellant could be found guilty without having participated in the commission of the crime and not objecting to the court's failure to define all the elements of 35 P.S. § 780–113(a)(12), respectively.

The Commonwealth's attorney, being vested with the sole discretion as to what crime(s) to charge, will not have that discretion impinged absent a gross abuse of discretion. *Commonwealth v. English,* 446 Pa.Super. 569, 667 A.2d 1123 (1995) (District Attorney and not trial court has the sole discretion to decide what offenses to charge); *Commonwealth v. Slick,* 432 Pa.Super. 563, 639 A.2d 482 (1982) (Semble). No such abuse of discretion was shown here. Alternatively, because the Drug Act is more specific (allowing for conviction when a "controlled" substance obtained by fraud) than the Pharmacy Act (labelling unlawful the procurement of "any drug" by fraud), the Commonwealth was not required to prosecute under the Pharmacy Act. Contrast *Commonwealth v. Vukovich,* 301 Pa.Super. 111, 447 A.2d 267 (1982) (Conviction for forgery (a general penal provision) reversed and a new trial awarded on charge of violating Pharmacy Act (special penal provision)).

It is true that the court charged:

> You may find the Defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime.

Vol. IV, 4/7–9/94 at 1148. Viewed in isolation, we would agree with the appellant that it is erroneous. However, appellate review of the trial court's charge must take into consideration the entire charge and not select segments. *Commonwealth v. La*, 433 Pa.Super. 432, 640 A.2d 1336, 1344 (1994). With that in mind, the preceding complained-of charge was succeeded immediately by the following directive to the jury that:

> A defendant is guilty of a crime if he is an accomplice of another person who commits that crime. He is an accomplice if with the intent of promoting or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it.

> You may find the Defendant guilty of a crime on the theory that he was an accomplice as long as you are satisfied beyond a reasonable doubt that the crime was committed and that the Defendant was an accomplice of the person who committed it.

Vol. IV, 4/7–9/94 at 1149. Read in context, and given its juxtaposition with the "accomplice" instruction, we find sophomoric appellate counsel's argument that the jury could not make the association between the now complained-of charge and the "accomplice" charge without the trial court "relat[ing] the concept of accomplice liability to its above instruction." To hold so would discount the common sense and intelligence of the jurors to follow instructions, constitute a myopic view of the charge and rule with judicial blinders on the overall picture of what actually transpired.

The "accomplice" charge fully and adequately explained the relevant precepts, which would have made trial counsel's objection thereto futile.

■ With regard to Subsection 12 of Section 780–113, the court instructed the jury:

In order to find him guilty of these offenses [Subsection 12], you must find beyond a reasonable doubt the following elements.

First, that the Defendant acquired or obtained possession of a controlled substance, the second, that the controlled substance was acquired by misrepresentation, fraud, forgery, deception or subterfuge.

\* \* \* \* \* \*

Fraud involves deliberate and intentional conduct calculated to deceive.

*Id.* at 1148. The appellant contests the court's failure to define "misrepresentation," "forgery," "deception," or "subterfuge," and trial counsel's failure to object to this misfeasance as prejudicial to his case warranting a new trial to remedy the alleged error.

We begin with the proposition that "in order to obtain relief on a claim of ineffectiveness, the defendant must prove that counsel's failure to object to an instruction was prejudicial to his case." *Commonwealth v. Humpheys*, 367 Pa.Super. 154, 532 A.2d 836, 840 (1987) (Citations omitted). Here, conceding the court's failure to define all of the terms under Subsection 12 of Section 780–113 does not end our inquiry. The appellant must show how he was prejudiced by trial counsel's omission. Save for the self-serving statement that "[h]ad the jury been properly instructed there is a reasonable probability that the Appellant would have been acquitted of all charges," (see Appellant's Supplemental Brief at 28), there is no basis in law or fact in support of the claim.

The crux of the case for the defense was Larsen's denial of any "knowledge" that what he and Dr. Humphreys were doing was criminal in nature. Each recounted being motivated by a desire to keep from all the media and public-at-large the mental illness afflicting the appellant. This was accomplished, for some twelve years, by the use of prescriptions issued in the appellant's employees' names to avoid disclosure of the true recipient of the controlled substance (Diazepam).

No claim was made by the Commonwealth that the appellant "misrepresented" himself to any third parties to secure drugs, or that he "forged" any instrument to accomplish this deed. Thus, for the court to have defined these terms would have been to expose the appellant to a conviction predicated upon conduct never engaged in by him. On the other hand, the evidence was saturated with proof of "fraud" (defined as an intent to deceive) sufficient for the jury to return a verdict for violating Subsection 12 of Section 780–113. Since the court did instruct on the meaning of "fraud" as one element which if proven to the jury's satisfaction ("beyond a reasonable doubt") would be sufficient to convict under Subsection 12 of Section 780–113, there was "little room for speculation by the jury[. As a result,] this Court h[o]ld[s] that the failure to define an element to the jury was not prejudicial error." *Humpheys*, supra, 367 Pa.Super. at 164, 532 A.2d at 840 (Citations omitted).

The remaining four claims have either been addressed (Issue XVI (dealing with classifying crimes misdemeanor rather than felony) and Issue XVII (sentencing on both conspiracies illegal)) or responded to in reply to an earlier claim (Issue XV (acquittal of counts three through sixteen warrant acquittal of Subsection 12) and Issue XVIII (removal from office not appropriate until appeals exhausted)).

Accordingly, finding merit only in the appellant's claim of *illegality of sentence* for the two conspiracies, we will remand to correct the sentence; but, in all other regards, we affirm the underlying *convictions* as substantiated by the evidence.

Judgment of sentence vacated, case remanded for resentence; jurisdiction is relinquished.